Chris SIMOPOULOS, M.D., Appellant,

v.

VIRGINIA STATE BOARD OF MEDI-
CINE, Marshall Coleman, Fairfax Hos-
pital Association, Potomac Hospital, Ap-
pellees.

No. 80–1431.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 4, 1980.

Decided March 19, 1981.

Roy Lucas, Washington, D. C., (Lucas &
Miller, P. C., Washington, D. C., on brief),
for appellant.

Gregory M. Luce, Asst. Atty. Gen., Rich-
mond, Va., (James E. Ryan, Jr., Deputy
Atty. Gen., John A. Rupp, Asst. Atty. Gen.,
Richmond, Va., on brief), for appellees.

Before BUTZNER, RUSSELL and
HALL, Circuit Judges.

RUSSELL, Circuit Judge:

In this § 1983 action for declaratory and
injunctive relief, the plaintiff, a physician,
sought judgment against the State Board
of Medicine (Virginia), the Attorney Gener-
al of Virginia, and two Virginia hospitals,
that certain provisions of the Virginia anti-
abortion statutes [1] and the related statute
authorizing the State Board of Medicine to
suspend any licensed physician upon convic-
tion of a violation of those anti-abortion
statutes,[2] were unconstitutional, and in that
connection prayed for injunctive relief
against any restriction upon, or suspension
of, the plaintiff's right to practice medicine
within the Commonwealth of Virginia, or to
continue as a staff member of the two
defendant hospitals on account of his con-
viction under the anti-abortion statutes.
The District Court dismissed the action un-
der the authority of *Younger v. Harris*, 401
U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1970),

---

1. §§ 18.2–71, *et seq.*, Code of Virginia (1950) as
amended.

2. § 54–321.2, Code of Virginia (1950) as amend-
ed.

and related cases. The plaintiff has appealed that dismissal. We affirm.

This action originated with plaintiff's arrest on November 29, 1979, under a warrant charging him with the crime of "performing on a minor, 17 years of age, an abortion during the second trimester of pregnancy and outside a hospital licensed by the State Department of Health or under the control of the State Board of Mental Health and Mental Retardation," in violation of § 18.2–73.[3] After arrest, he demanded a preliminary hearing prior to submission of any indictment to the grand jury. This request was granted. The preliminary hearing, however, was continued at the plaintiff's request, from the date originally set until January 15, 1980. While the preliminary hearing was thus delayed, the plaintiff instituted on December 27, 1979, a § 1983 action in the District Court styled *Simopoulos v. Horan,* to enjoin any prosecution under the arrest warrant, as well as any other prosecutions under § 18.2–73, on the ground that the statute on which the prosecution was based was unconstitutional. The District Court being "of the opinion that it should abstain from interfering in that State's prosecution," dismissed that action on January 16, 1980. The plaintiff appealed the dismissal, and pending hearing of that appeal, sought from the Court a temporary injunction against prosecution. The request for injunctive relief pending appeal was denied and later, by consent, the appeal itself was dismissed. The prosecution in the State Circuit Court then proceeded and resulted in the plaintiff's conviction and sentencing on April 18, 1980. That conviction has been appealed and is now pending before the Virginia Supreme Court.

Upon the defendant's conviction in the State Circuit Court being certified to it, the defendant Board of Medicine revoked the plaintiff's Virginia license to practice medicine on May 23, 1980, pursuant to § 54–321.2 of the Virginia Code (1950) as amended. Under the terms of that section, the defendant secretary of the Board of Medicine is directed to suspend "without a hearing, the certificate or license of any person," who has "suffered a conviction as described in § 54–317.1(1) . . . ." One of the grounds of "unprofessional conduct" by a "practitioner of medicine" under § 54–317(1) is engaging "in any manner or by any means whatsoever to procure or perform or to aid or abet in procuring or performing a criminal abortion; . . ." § 54–321.2, however, provides that any person whose license to practice medicine has been suspended thereunder may apply "for termination of such suspension or revocation and reinstatement of his certificate or license." When such application is made the Board of Medicine is obligated to give the applicant a full hearing, with the right to be represented by counsel, and to summon witnesses in his behalf. The proceedings on such application before the Board are to be "recorded formally." The revocation of a suspension requires the "affirmative vote of three fourths of the members at the hearing." Should the application for revocation be denied by the Board, the applicant has a right to appeal "to the circuit court of the county or the circuit or corporation court of the city within whose jurisdiction he resides, for a review of such proceedings." § 54–320, Virginia Code (1950).

After being advised of the suspension of his license, the plaintiff requested orally a hearing before the Board of Medicine for the purpose of seeking a revocation or stay, pending appeal of his criminal conviction, of the suspension. A hearing on that request was set for July 18, 1980. Without waiting, however, for such hearing the plaintiff filed this action in the United States District Court on June 5, 1980. He stated his "claims" on the basis of which he sought relief as follows:

"(I) Va.Code § 54–321.2 is unconstitutional on its face and as applied, for failure to provide a pre-revocation hearing consistent with the due

---

**3.** This section was enacted in 1975 as an amendment to § 18.2–71 in order to bring the latter "into compliance with *Roe v. Wade,* . . . ." Note, *Twentieth Annual Survey of Developments of Virginia Law,* 1974–5, 61 Va.L. Rev. 1627 at 1711 (1975).

process clause of the Fourteenth Amendment;

"(II) Defendants cannot revoke or suspend Dr. Simopoulos' license and/or hospital privileges because the underlying conviction was based on a statute, Va.Code § 18.2–71, –74, which is unconstitutional in violation of the due process and equal protection clauses, and right of privacy in the Fourteenth Amendment."

In setting forth his request for judgment he asked for "[d]eclaratory judgments that Va. Code §§ 54–321.2 and 18–2–71, –74, are unconstitutional in violation of the due process and equal protection clauses, and right of privacy in the Fourteenth Amendment," and for injunctive relief, both preliminary and permanent, restoring him to "his unrestricted license to practice medicine" and to "the hospital staff membership and privileges which he previously held" at the two defendant hospitals. Contemporaneous with the filing of his complaint, the plaintiff moved for a temporary restraining order and preliminary injunction, accompanying such motion with supporting authorities. On June 20, 1980, the District Court denied the motion and dismissed the action. In so doing, the District Court restated its earlier decision in *Simopoulos v. Horan* to abstain from consideration of the plaintiff's attack on the constitutionality of the Virginia anti-abortion statute and found that § 54–321.2 was on its face reasonable, citing *Christhilf v. Annapolis Emergency Hospital Ass'n, Inc.*, 496 F.2d 174 (4th Cir. 1974). It added that the plaintiff, if he felt aggrieved at the suspension of his license, might apply for a hearing before the Board of Medicine. From that dismissal the plaintiff has appealed.

On July 18, 1980, the plaintiff was heard in person and by counsel on his application to the Board of Medicine for a revocation of his suspension, pending appeal of his convic-tion to the Virginia Supreme Court. On July 29, 1980, the plaintiff was officially notified that his application was denied. The plaintiff has appealed this denial of his application to the State Circuit Court, as authorized under the statute. He has "based" his appeal "upon inconsistencies between the Board's hearing on the matter and the requirements of the Administration Process Act, Va.Code 9–6.14, *et seq.*" In his counsel's letter transmitting his notice of appeal the plaintiff disclaimed expressly "an attempt on [his] part to pursue dual appeals in state and federal courts on the same questions. Dr. Simopoulos' appeal before the United States Court of Appeals for the Fourth Circuit involves questions of federal law that are separate and distinct from the state law issues that will be raised before the Fifteenth Circuit Court, City of Richmond." [4]

To recapitulate: the plaintiff has appealed to this Court the dismissal of this action in the District Court for declaratory and injunctive relief, and it is this appeal which is before us. He has also appealed his criminal conviction under the abortion statute to the State Supreme Court; and, under the procedure for appeal from decisions of the Board of Medicine, as provided in § 54–321.-2, he has appealed the denial of either a revocation or a stay, pending appeal, of his license suspension to the State Circuit Court. The District Court held, as we have said, that dismissal of the federal action was mandated under the principles declared in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1970), and related cases, leaving plaintiff to the litigation of his state and federal claims in the state court. The issue on appeal thus is whether the *Younger* doctrine proscribes the maintenance of plaintiff's action for declaratory and injunctive relief in the federal court. The resolution of this issue requires examination of the *Younger* doctrine as it applies

---

4. This attempt of the plaintiff to limit his State appeals to State issues, reserving for federal review his federal claims, was similar to the action of the plaintiff in *Scruggs v. Campbell*, 630 F.2d 237 (4th Cir. 1980). Such procedure was plainly contrary to the language of the Supreme Court in *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), as well as our ruling in *Scruggs*.

to the federal action and the relation of such doctrine to the facts of this case.

In *Younger* and the five other cases decided the same day,[5] often described as the "February Sextet,"[6] the Supreme Court formulated the principles restraining interference by federal courts with state court proceedings. Under these principles when relief sought by a plaintiff in a federal action is available in a pending state criminal proceeding, the federal court, except in certain specific extraordinary circumstances, must apply equitable estoppel and abstain by dismissing outright the federal suit and by requiring the "presentation of all claims, both state and federal, to the state courts."[7] This rule generally known as the *Younger* doctrine, does not extend merely to direct relief against the state prosecution; it "denies any relief that depends on resolution of the constitutional issue raised in the state case."[8] Accordingly, it not only denies federal injunctive relief against the state action; it also closes the door of the federal court to an action for "prospective" relief by way of a declaratory judgment finding the statute involved in the criminal proceeding unconstitutional.[9] The basis for this doctrine was stated to be consideration of equity, comity and federal-ism.[10] In exposition of these considerations, the Supreme Court observed that traditionally courts of equity did not interfere with criminal prosecutions, where the complaining party has an adequate remedy at law and will not suffer irreparable injury if injunctive relief is not granted. An even more vital consideration for the doctrine than equitable principles was stated to be that of comity, which assumes that a federal government fares best where there is due respect accorded the separate functioning of the States. And, lastly, abstention by federal courts was prompted by consideration of federalism which recognizes that a "National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States."[11]

The Supreme Court in *Younger* had not dealt explicitly with the application of its principles to civil cases, though there was some language in Justice Black's opinion for the Court suggesting that the same considerations that denied federal relief in state criminal proceedings might apply also to certain state civil proceedings.[12] How-

---

5. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Byrne v. Karalexis*, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971); *Dyson v. Stein*, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); *Perez v. Ledesoma*, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 474 (1971); *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); *Boyle v. Landry*, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971).

6. This is the description applied to these cases in Note, *Limiting the Younger Doctrine: A Critique and Proposal*, 67 Cal.L.Rev. 1318, 1323 (1979). *See also American Civil Liberties v. Bozardt*, 539 F.2d 340, 342 (4th Cir. 1976).

7. For the requirement that all claims, state and federal, must be presented to the state court under *Younger, see Gibson v. Berryhill*, 411 U.S. 564, 577, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973); *American Civil Liberties Union v. Bozardt, supra*, 539 F.2d 342; *see also* Laycock, *Federal Interference with State Prosecutions: The Need for Prospective Relief*, 1977 Supreme Court Review, 193, 196.

8. Laycock, 1977 Supreme Court Review, at 196.

9. *Samuels v. Mackell, supra*, 401 U.S. at 72–73, 91 S.Ct. at 767–68. In reaching this conclusion, the Court reasoned that a declaratory judgment "will result in precisely the same interference with and disruption of state proceedings" as would an injunction. This is true, it concluded, because a declaratory judgment would be considered "res judicata" in the state court, or because a declaratory judgment could serve as a basis for a subsequent injunction to "protect or effectuate" that declaratory judgment.

10. 401 U.S. at 43–47, 91 S.Ct. at 750–52.

11. 401 U.S. at 44, 91 S.Ct. at 750.

12. *See* 401 U.S. at 45, 91 S.Ct. at 751:
    "This brief discussion should be enough to suggest some of the reasons why it has been perfectly natural for our cases to repeat time and time again that the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions."

ever, we concluded in *Lynch v. Snepp*, 472 F.2d 769, 773 (4th Cir. 1973), *cert. denied*, 415 U.S. 983, 94 S.Ct. 1576, 39 L.Ed.2d 880 (1974), that, in a proper set of circumstances, *Younger* would apply to state civil proceedings in the same way as it did to a state criminal proceeding, since that doctrine "should never be made to turn on such labels as 'civil' or 'criminal' but rather upon an analysis of the competing interests in each case." And Justice Rehnquist, as Circuit Justice, in denying a stay of a Circuit Court of Appeals' decision in *Cousins v. Wigoda*, 463 F.2d 603 (7th Cir. 1972), declared that prior Supreme Court decisions had indicated that on purely comity grounds federal courts should not "casually enjoin the conduct of pending state court proceedings of either [criminal or civil] type." *Cousins v. Wigoda*, 409 U.S. 1201, 1206, 92 S.Ct. 2610, 2614, 34 L.Ed.2d 15 (1972). Three years later, the Supreme Court itself, while making "no general pronouncements upon the applicability of *Younger* to all civil litigation,"[13] created "a limited 'civil counterpart' to the *Younger* criminal doctrine," under which the same restraints on federal action commanded by considerations of comity and federalism [in the criminal context], would extend to state civil proceedings to which the state was a party and which was operated in aid of and by way of facilitating compliance with a state's criminal laws. It, also, proceeded to declare that a party, before he was entitled to invoke federal intervention under § 1983 was required to exhaust all possible state appellate proceedings.[14]

The extension of *Younger* to state civil proceedings of a "quasi-criminal" type in Huffman was further broadened in *Juidice*

*v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977), and *Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979). The Supreme Court stressing that the rationale for the *Younger* doctrine went well beyond the traditional principles of private equity jurisprudence and rested primarily on comity, said in *Juidice*:

"We now hold, however, that the principles of *Younger* and *Huffman* are not confined solely to the types of state action which were sought to be enjoined in those cases. As we emphasized in *Huffman*, the 'more vital consideration' behind the *Younger* doctrine of nonintervention lay not in the fact that the state criminal process was involved but rather

" 'in the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.' "[15]

This language, as well as the language of the Supreme Court in *Trainor v. Hernandez, supra*, prompted one commentator to declare that "[i]ncreasingly, the *Younger* rationale is based not on considerations of equity, comity and federalism, but upon comity and federalism alone," a result which he finds, may foreshadow "an extension of the *Younger* doctrine, without exception, to all pending state proceedings," despite the *Juidice-Trainor* Court's express

---

**13.** *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 607, 95 S.Ct. 1200, 1209, 43 L.Ed.2d 482 (1975).

In his dissent in *Juidice v. Vail*, 430 U.S. 327, 344–45, 97 S.Ct. 1211, 1221–22, 51 L.Ed.2d 376 n (1977), Justice Brennan said:

"I suspect that the purported disclaimer that '[a]s we did in *Huffman*, we save for another day the question of "the applicability of *Younger* to all civil litigation . . . ,' " *ante*, at 336 n. 13, 97 S.Ct. at 1218 n. 13, is tongue in cheek, and that 'save' in today's disclaimer is a signal that merely the formal announcement is being postponed."

This statement was offered in explanation of Justice Brennan's opinion that the extension of *Huffman's* "quasi-criminal" rationale to a state's contempt powers in a suit between private parties was but a cover "for the ultimate goal of denying § 1983 plaintiffs the federal forum in any case, civil or criminal, when a pending state proceeding may hear the federal plaintiff's federal claims."

**14.** 420 U.S. at 609–10, 95 S.Ct. at 1210–11.

**15.** 430 U.S. at 334, 97 S.Ct. at 1216.

reservation of the question of extending *Younger* to all pending state litigation.[16] And the decisions in *Juidice* and later cases bore out, to some extent at least, this prediction. Thus, in *Juidice*, the Court applied *Younger* to a suit attacking a state contempt proceeding arising out of a suit between *private* parties, holding that the state interest in vindicating "the regular operation of its judicial system" was sufficient on comity and federalism grounds to foreclose federal action;[17] in *Trainor* to an attachment proceeding incident to a state suit brought in the state's sovereign capacity to recover welfare payments alleged to have been fraudulently obtained,[18] and in *Moore*, to a proceeding under a state family code to remove an abused child from parental custody under which an *ex parte* removal of the child from parental control, subject to a later hearing, was authorized.[19]

Whether *Younger* applies where the state proceeding is pending before a state administrative agency rather than a state court is a question which has not yet been explicitly answered by the Supreme Court. *Gibson v. Berryhill, supra*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488, indicates that, under certain circumstances, such pendency would be sufficient to invoke *Younger*. There, the pending state proceedings was before the State Board of Optometry, with right of appeal to the state court, and involved the revocation of the plaintiff's professional license. The Supreme Court appears to have assumed that *Younger* could bar plain-

tiff's § 1983 action but refused to apply it because it found the Board "biased," thereby denying the plaintiff a fair state administrative tribunal for the resolution of his constitutional claims. And in *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977), the Court found that, because the state agency defendants had not claimed, but had specifically waived any claim for abstention, it "need not and [did] not express any view on [or decide] whether the District Court erred in refusing to abstain on *Younger* grounds." 431 U.S. at 480, n. 10, 97 S.Ct. at 1904 n. 10. However, the Court did comment that *Younger* "reflects 'a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways *that will not unduly interfere with the legitimate activities of the State*, '(citing cases). *Younger* and these cited cases express equitable principles of comity and federalism. They are designed to allow the State an opportunity to 'set its own house in order' when the federal issue is already before *a state tribunal*." [20] The term "state tribunal" in *Hodory* was undoubtedly used advisedly and clearly would comprehend a state administrative proceeding, particularly if the decision of the administrative agency were subject to appeal to the state court under procedures permit-

---

**16.** Comment, *Closing the Courthouse Door: The Expanding Rationale of Younger Abstention*, 19 Boston College L.Rev. 699, 720–21 (1978).

**17.** This case is analyzed in Note, *Constitutional Law-Supreme Court Extends Younger Comity Doctrine*, 46 Fordham L.Rev. 176 (1977), and in a Note, *Federal Jurisdiction-Younger Doctrine Extended to Preclude Federal Court Intervention Where Parties have an Opportunity to Present Their Claim Within the State Civil Proceeding*, 8 Cumberland L.Rev. 589 (1977).

**18.** This case and *Juidice* are discussed together in the Comment, *supra*, 19 Boston College L.Rev. 699.

**19.** This case is discussed in Comment, *Moore v. Sims: A Further Expansion of the Younger*

*Abstention Doctrine*, 1 Pace L.Rev. 149 (1980), and in a Note in 49 Cinn.L.Rev. 301 (1980). In the latter note, the author observed that Justice Stevens had dissented because he considered "the state and federal suits were independent of one another. The state court action concerned the parent-child relationship, whereas the federal suit concerned the constitutionality of the child's removal." *Ibid.* at 308. The Court majority, however, seems to have found the two issues related and found that the federal plaintiffs had a right to raise such issues in the state proceeding.

**20.** *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471, 479–80, 97 S.Ct. 1898, 1903–04 (Italics added).

ting the assertion of constitutional claims. And in *Rucker v. Wilson*, 475 F.Supp. 1164 (E.D.Mich.1979), a case almost identical in many aspects with this case, the Court applied *Younger* in the context of a state administrative proceeding.

In *Rucker*, the plaintiff, a physician, had been charged "with a number of improprieties in connection with the performance of abortions." These improprieties had occurred in 1973 and 1974. The hearings on those charges before the Michigan Board of Medicine were delayed until the Spring of 1979. The plaintiff claimed the delay in pressing the charges denied him due process. When the Board refused to sustain this claim and proceeded with its hearing on the charge, the plaintiff began his § 1983 federal action. The defendant Board sought dismissal of the action on the basis of the *Younger* doctrine. After remarking that the State was in fact a party to the administrative proceedings and that those proceedings were closely related to the state criminal laws dealing with abortions, the Court stated that if the state proceedings had been "before a court, this court could merely cite *Huffman* and dismiss the case." It proceeded to apply *Younger* to the proceedings, declaring that the position of the plaintiff in resisting abstention differs from that of the plaintiff in *Huffman* "only in the type of tribunal before which the state proceedings are being held." Under such circumstances, the Court upheld defendant's claim of abstention with this reasoning:

"All of the same interests exist here as existed there, and for all the same reasons of comity, equity, and federalism, this court holds that the *Younger* doctrine does apply to administrative proceedings like this one where the state is a party. The enforcement of state criminal laws is involved, and there is a right to appeal any federal constitutional questions to the state courts. It is important to give litigants a fair opportunity to be heard in court, but there is no reason to give everyone two full bites at the judicial apple. The appeal process is more than adequate protection for the constitutional rights involved here." [21]

We find the reasoning of *Rucker* convincing,[22] though it is not necessary to go as far in this case as the Court did in *Rucker*, since there is pending an appeal to the State Circuit Court from the decision of the Board of Medicine in refusing a revocation of plaintiff's suspension.

The Supreme Court has, as the plaintiff argues, recognized certain exceptions to the applicability of *Younger* but these exceptions were restricted by *Younger* to what it described as "exceptional and extremely limited circumstances," creating a threat of great, immediate and irreparable injury.[23] The Court added that, in order to meet the test of "irreparable injury," the threat of the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution.[24] Later, in subsequent cases, the Court, in shifting from equity, comity and federalism to comity and federalism alone as the rationale for its abstention doctrine,[25] had made it plain that, save in one situation we discuss later, "vital considerations" of comity and federalism permit a disregard of *Younger* only if the state procedure fails to provide the federal plaintiff with an adequate opportunity to litigate in the state forum his constitutional claim. In fact, this, as we have observed, is what the Court said in *Younger*. It made the point clearer in *Kugler v. Helfant*, 421 U.S. 117, 124, 95 S.Ct. 1524, 1530, 44 L.Ed.2d 15 (1975):

"Only if 'extraordinary circumstances' render the state court incapable of fairly and fully adjudicating the federal issues

---

21. 475 F.Supp. at 1166.

22. We followed substantially the same reasoning as did the *Rucker* Court in the recent case of *North v. Budig, et al.*, 637 F.2d 246 (4th Cir. 1981).

23. *See Younger v. Harris, supra*, 401 U.S. at 56, 91 S.Ct. at 755 (Stewart, J., concurring).

24. 401 U.S. at 46, 91 S.Ct. at 751.

25. *See* 19 Boston College Law Review, *supra*, at 721.

before it, can there be any relaxation of the deference to be accorded to the state criminal process."

And recently in *Moore v. Sims*, 442 U.S. at 430, 99 S.Ct. at 2381 (involving a civil proceeding), the Court, after emphasizing that the real premise for *Younger* was comity, said that:

> "The price exacted in terms of comity [to abstain from interference with pending state proceedings] would only be outweighed [by the need to allow federal intervention] if state courts were not competent to adjudicate federal constitutional claims—a postulate we have repeatedly and emphatically rejected. *Huffman, supra,* [420 U.S.] at 610–11 [95 S.Ct. at 1211]. In sum, the only pertinent inquiry [in determining whether there are 'exceptional circumstances' justifying disregard of *Younger*] is whether the state proceedings afford an adequate opportunity to raise the constitutional claims, ...."[26]

And, as was the case in *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54

(1975), all the exceptions based on "exceptional considerations," have involved situations in which the federal plaintiff's claim for federal relief was not such as could be resolved in a pending state proceeding. Thus, bad faith or harassment, *i.e.,* "official lawlessness," in the prosecution,[27] lack of an unbiased and impartial state tribunal,[28] the absence of a pending state proceeding in which the federal plaintiff might assert his constitutional claim,[29] all present situations which afford the plaintiff no adequate state remedy for the resolution of his constitutional claim.[30] The single "exceptional circumstance" not meeting this test is that based on the claim that the underlying statute for either the criminal or civil proceeding was "flagrantly and patently" unconstitutional. In stating this exception initially, the Court was careful to point out that "facial invalidity" of the challenged statute would not qualify under this exception. Thus, in *Huffman*, the Court declared, referring back to *Younger*:

> "But we unequivocally held that facial invalidity of a statute is not itself an

---

**26.** This point was further underscored in *Juidice, supra,* 430 U.S. at 337, 97 S.Ct. at 1218, where the Court, in distinguishing *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) said that the issue in that case was "one" that "could not be raised in defense of the criminal prosecution." It was, also a basis for our decision in the recent case of *Anderson v. Babb,* 632 F.2d 300 (4th Cir. 1980).

> See also 1 Pace L.Rev., *supra,* at 165–66:
> "In determining whether a particular case comes within the exceptions to the *Younger* doctrine, courts focus primarily on the adequacy of remedies available at law. Indeed, a finding of adequacy may obviate the need to consider the issue of irreparable harm; if an existing remedy is found to be adequate, that finding itself implies that any harm is repairable. Moreover, although *Younger* provides that irreparable harm can be inferred from bad faith and harassment, these circumstances can also be viewed as factors in measuring the adequacy of the state forum. The various exceptions to *Younger,* therefore, can be seen as 'different ways of showing that the state legal apparatus has broken down so thoroughly that federal rights cannot be vindicated through it in a timely fashion.' "

**27.** The difficulties of establishing this exception are illustrated by *Hicks v. Miranda,* 422 U.S. 332 at 350–51, 95 S.Ct. 2281 at 2292, 45 L.Ed.2d

223 (1975); *Kugler v. Helfant, supra,* 421 U.S. at 124, 95 S.Ct. at 1530; *Perez v. Ledesma, supra,* 401 U.S. at 85, 91 S.Ct. at 676, in no one of which was the exception sustained.

In 67 Cal.L.Rev., *supra,* at 1328–29, the author, speaking to this exception, says:
> "Since *Younger,* however, the Court has never allowed federal interference with a pending state proceeding on these grounds.
> "This exception seems inconsistent with the principles underlying the *Younger* doctrine—*i. e.,* that the state courts will normally protect federal rights, removing any threat of 'irreparable injury' that might justify federal injunctive relief. Unless the state court cannot be relied upon for full and fair adjudication of constitutional claims (an independent exception to the *Younger* doctrine), prosecutorial bad faith presents no threat of irreparable injury."

**28.** *Gibson v. Berryhill, supra,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488; *Timmerman v. Brown,* 528 F.2d 811 (4th Cir. 1975).

**29.** *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977).

**30.** *See* Note 26.

exceptional circumstance justifying federal interference with state criminal proceedings." [31]

Later, in *Juidice*, the Supreme Court defined the "flagrantly and patently" unconstitutional exceptions with greater specificity and more narrowly as requiring invalidity "in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it," [32] a standard so rigorous as to make the exception, in the words of Professor Laycock, "meaningless." [33] As a practical matter, then, "the centerpiece of a test for the application of *Younger*" is always the adequacy of the state forum in providing the federal plaintiff an opportunity to raise his constitutional claim and, if there is, comity commands abstention by the federal court.[34]

Applying the *Younger* doctrine, as it has developed in subsequent decisions, to the facts of this case, we have no doubt that the attempt by the plaintiff to secure either declaratory or injunctive relief against the state abortion statute (§§ 18.2–71, *et seq.*, Code of Virginia (1950) as amended) is foreclosed by the decision in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), which involved the exact issue posed by the plaintiff in this case in his attack on the present statute. In *Roe*, a physician, was charged, as the plaintiff was in this case, with violation of a state criminal abortion statute. He asserted standing as a "potential future defendant" because of threats of other prosecutions, he sought to intervene in a pending action involving a constitutional attack on a statute similar to the one under which he was being prosecuted, and prayed for a declaratory judgment of the

unconstitutionality of the statute under which he had been convicted. The District Court upheld his standing, granted his motion to intervene, and entered a declaratory judgment against the statute's validity. On Appeal, the Supreme Court reversed, saying:

> "Our decision in *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), compels the conclusion that the District Court erred when it granted declaratory relief to Dr. Hallford instead of refraining from so doing." [35]

The only way in which the plaintiff could challenge such a result would be by a claim of "official lawlessness," to use Justice Stewart's phrase in *Younger*, quoted *supra*, or of the lack of an opportunity to raise his constitutional claim in the state forum. The plaintiff makes no claim of "official lawlessness" in this case.

His attack on the license suspension statute (§ 54–321.2, Code of Virginia (1950) as amended), on the other hand, falls within the proscription established in *Huffman*. Since § 54–321.2 was clearly enacted in aid of and for the purpose of facilitating the standards established in the state abortion statute, it unquestionably qualified for abstention under the "quasi-criminal" standard established in *Huffman*.[36] It is true that the plaintiff's state remedy for challenging § 54–321.2 is initially in the administrative proceedings before the Board of Medicine, but any decision in those proceedings is subject to broad judicial review. The plaintiff's status in the administrative proceedings is exactly like that of the plaintiff in *Scruggs v. Campbell, supra*, 630 F.2d 237, as well as the plaintiffs in *Berryhill*,

---

**31.** 420 U.S. at 602, 95 S.Ct. at 1207.
  See also 19 Boston College L.Rev. *supra*, at 734–35, and 67 Cal.L.Rev. *supra*, at 1329.

**32.** 430 U.S. at 338, 97 S.Ct. at 1218.

**33.** Laycock, 1977 Supreme Court Review, *supra*, at 198; *see also*, Note. 19 Boston College L.Rev., *supra*, at 734–35.

**34.** Aldisert, 11 Conn.L.Rev., *supra*, at 197.

**35.** 410 U.S. at 126, 93 S.Ct. at 713. *See also, Anders v. Floyd*, 440 U.S. 445, 99 S.Ct. 1200, 59

L.Ed.2d 442 (1979), *reh. denied*, 441 U.S. 928, 99 S.Ct. 2043, 60 L.Ed.2d 403.

**36.** That the two statutes (*i. e.*, the abortion statute and the suspension statute) are related and are integrated parts of a common legislative scheme to prevent illegal abortions is evidenced by the fact that the plaintiff in his prayer for a declaratory judgment of unconstitutionality and in his request for injunctive relief lumps the two statutes together.

*supra*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488, and in *Rucker, supra*, 475 F.Supp. 1164. In those cases, as we have already seen, the pendency of an administrative proceeding subject to broad judicial review, was held expressly in *Scruggs* and *Rucker*, and implicitly in *Berryhill*, to support *Younger* treatment. And this is particularly so in this case, since before any substantive action in favor of the plaintiff had begun, the plaintiff had appealed the administrative decision by the Board of Medicine to the state court. This circumstance brought the present case within our language in *Scruggs*, 630 F.2d at 239:

> "Although no state suit was pending when the Scruggs filed their federal action, federal abstention became appropriate when the board sought review in the state court. After the state suit was brought to the attention of the district court, it properly abstained because no proceedings on the merits of the claim had been conducted in the federal courts. *Hicks v. Miranda*, 422 U.S. 332, 349–50 [95 S.Ct. 2281, 2291–92]...."

Accordingly, whether we follow the reasoning of *Rucker* or not, the fact that, before any substantial action in this federal action had taken place, the administrative pro-

ceedings had been appealed to, and its decision was under broad review before the state court, brought the proceeding within the rule stated in *Hicks* and followed by us in *Scruggs*.[37]

It remains to note some special arguments made by the plaintiff on this appeal. It seems to have been the plaintiff's idea that in his appeal from the action of the Board of Medicine on his license suspension, he could bifurcate his appeal, submitting only state issues to the state court and federal constitutional claims to the federal court in his proceedings in the district court, thereby sustaining jurisdiction in the district court. But in *Huffman* the Supreme Court made it quite clear that no such "truncation" was permitted.[38] The plaintiff also complains of the delay that inheres in the state appellate proceedings and suggests that this delay provides a basis for an exception to *Younger*, thus permitting the maintenance of his federal suit. This argument, too, was answered against the plaintiff in *Huffman*.[39] The argument by the plaintiff that, in his district court action, he is not attacking his conviction but only seeking "prospective" relief is disingenuous. In his complaint, at least thirty-five para-

---

**37.** Under § 9–6.14:17, Code of Virginia (1950) as amended, the plaintiff has the right on the judicial review before the state court of the Board of Medicine's decision to raise the issue of error of law, which the state declares includes "constitutional right, power, privilege, or immunity," language patently broad enough to include the plaintiff's objection to the statute on constitutional grounds. Actually, the plaintiff's constitutional objection to the statute, which is that his license was suspended without a hearing but subject to a right to a prompt hearing for revocation of that suspension, is one that we examined in *Christhilf v. Annapolis Emergency Hospital Ass'n., Inc., supra*, 496 F.2d 174. We held there that there is no absolute rule that there be a hearing before a doctor's privileges are suspended. *Ibid.* at 180. Whether there could be a suspension without a hearing depends largely on the gravity of the charges and the nature of the proof. In this case, the charge was a violation of a criminal statute *as established by a criminal conviction.* That plainly can be said to meet the test for a suspension without a prior hearing, especially since the statute extends to the plaintiff a prompt hearing on the suspension if he re-

quests it. *See Morrissey v. Brewer*, 408 U.S. 471, 490, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972), where the Court said that in parole revocation, just as here in a suspension of a physician's license to practice, the Court might proceed without an initial hearing if the revocation "is based on conviction of another crime" since the parolee "cannot relitigate issues determined against him in other forums."

It is true that in subsequent proceedings the plaintiff was given relief in *Christhilf* but such relief was given because the defendants delayed for over three years the hearing on the plaintiff's earlier *ex parte* suspension, *Christhilf v. Annapolis Emergency H. Ass'n Inc.*, 552 F.2d 1070 (4th Cir. 1977). We have no such situation here. The plaintiff in this case was given a prompt hearing before the Board on his request for revocation of his suspension and a decision on such request has been filed and is now on appeal to the state court.

**38.** 420 U.S. at 610, 95 S.Ct. at 1211.

**39.** 420 U.S. at 608, 95 S.Ct. at 1210.

graphs [40] constitute exclusively an attack on his conviction and the statute under which he was convicted and, in his prayer, he asks for specific declaratory relief against the specific antiabortion statute under which he was convicted. It may be that he conceives of declaratory relief as "prospective" but, if he does, that is not a justification for disregarding *Younger. Samuels v. Mackell, supra*, as we have seen, declares unequivocally that declaratory relief is not to be distinguished from injunctive relief and is equally within the proscriptions of the *Younger* doctrine.

It follows that the District Court correctly dismissed this action, and remitted the plaintiff to his two pending state appeals for the redress of his rights, whether under state or federal law. Since we affirm the dismissal, the grant of an injunction pending appeal of the plaintiff's suspension under § 54–321.2 is vacated.

The judgment of the District Court is accordingly

*AFFIRMED.*

BUTZNER, Circuit Judge, concurring and dissenting:

I agree with much of Judge Russell's scholarly opinion. Specifically, I concur in the affirmance of the part of the district court's judgment that dismissed on the basis of abstention Dr. Simopoulos's claim that certain Virginia abortion statutes are unconstitutional. For reasons adequately explained in the majority opinion, *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its related cases provide controlling authority for abstention on this issue.

I dissent from the part of the majority opinion that holds abstention is also required with respect to the doctor's claim that his license was revoked without affording him procedural due process of law.

## I

In determining whether abstention is required, the Supreme Court has distinguished claims of the denial of substantive constitutional rights unaccompanied by denial of procedural due process of law from claims that are based on the complainant's inability to have his substantive federal rights decided by a state forum in accordance with procedural due process. *Compare Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), *with Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977). The Court clarified the significance of this distinction in *Gibson*, 411 U.S. at 577, 93 S.Ct. at 1697, where, referring to a denial of procedural due process, it said:

> *Younger v. Harris* contemplates the outright dismissal of the federal suit, and the presentation of all claims, both state and federal, to the state courts. Such a course naturally presupposes the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved. Here the predicate for a *Younger v. Harris* dismissal was lacking, for the appellees alleged, and the District Court concluded, that the State Board of Optometry was incompetent by reason of bias to adjudicate the issues pending before it. If the District Court's conclusion was correct in this regard, it was also correct that it need not defer to the Board. Nor, in these circumstances, would a different result be required simply because judicial review, *de novo* or otherwise, would be forthcoming at the conclusion of the administrative proceedings.

The Court has consistently recognized this predicate of *Younger. See, e. g., Moore v. Sims*, 442 U.S. 415, 430, 99 S.Ct. 2371, 2381, 60 L.Ed.2d 994 (1979); *Trainor v. Hernandez*, 431 U.S. 434, 441, 97 S.Ct. 1911, 1916, 52 L.Ed.2d 486 (1977); *Juidice v. Vail*, 430 U.S. 327, 337, 97 S.Ct. 1211, 1218, 51 L.Ed.2d 376 (1977); *Huffman v. Pursue*, 420 U.S. 592, 594, 95 S.Ct. 1200, 1204, 43 L.Ed.2d 482 (1975).

The facts disclosed by this record establish that the essential predicate for abstention explained in *Gibson* is lacking with respect to the doctor's claim that he was deprived of his license without procedural

40. *See* paragraphs 30 through 67.

due process of law. Time and again the Supreme Court has reiterated that due process encompasses "the opportunity to be heard ... 'at a meaningful time and in a meaningful manner.'" *See Barry v. Barchi*, 443 U.S. 55, 66, 99 S.Ct. 2642, 2650, 61 L.Ed.2d 365 (1979). Parts III and IV of my dissent demonstrate that the state administrative hearing after the summary revocation of the doctor's license lacked these fundamental attributes of procedural due process. But first it is necessary to recount pertinent aspects of the state criminal and administrative proceedings.

## II

The doctor was convicted of violating Virginia statutes that proscribe as felonies second trimester abortions unless they are performed in a licensed hospital. Va.Code §§ 18.2-71 and 73. His principal defense was that these statutes are unconstitutional facially and as applied to the circumstances of his case.[1] Relying on *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 747 (1973), the doctor insisted that the statutes requiring hospitalization were not reasonably related to the health of his patient. In support, he presented as witnesses the chairman of the department of obstetrics and gynecology at the Albert Einstein College of Medicine, an associate clinical professor in obstetrics and gynecology at George Washington University, and a Virginia physician who specializes in obstetrics and gynecology. These witnesses testified that the procedure followed by the doctor is acceptable medical practice in an outpatient facility, and they stated that the doctor's clinic was well equipped for such practice. One of the witnesses added that even when treatments to induce a second trimester abortion are administered at a Virginia hospital, where he had served as chairman of the department of obstetrics and gynecology, the patients are frequently allowed to leave the hospital before they abort. The state presented no witness to contradict this testimony.

Although not precisely on point, *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), is instructive. There the Court held unconstitutional a statute requiring that abortions be performed only in hospitals accredited by the Joint Commission on Accreditation of Hospitals. At 410 U.S. 194-95, 93 S.Ct. 748-49, the Court explained the criteria that should govern the determination of the constitutionality of statutes that require the performance of abortions in hospitals:

This is not to say that Georgia may not or should not, from and after the end of the first trimester, adopt standards for licensing all facilities where abortions may be performed so long as those standards are legitimately related to the objective the State seeks to accomplish. The appellants [who challenged the constitutionality of the statute] contend that such a relationship would be lacking even in a lesser requirement that an abortion be performed in a licensed hospital, as opposed to a facility, such as a clinic, that may be required by the State to possess all the staffing and services necessary to perform an abortion safely (including those adequate to handle serious complications or other emergency, or arrangements with a nearby hospital to provide such services). Appellants and various *amici* have presented us with a mass of data purporting to demonstrate that some facilities other than hospitals are entirely adequate to perform abortions if they possess these qualifications. The State, on the other hand, has not presented persuasive data to show that only hospitals meet its acknowledged interest in insuring the quality of the operation and

---

1. The application of the statute was asserted to be unconstitutional because it was administered in conjunction with hospital rules that required parental consent for a minor's abortion. *See Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 483 F.Supp. 679, 687 (W.D. Mo.1980). *Cf. Bellotti v. Baird*, 443 U.S. 622,

651, 99 S.Ct. 3035, 3052, 61 L.Ed.2d 797 (1979); *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976) (statutes unqualifiedly imposing provisions for parental consent are unconstitutional).

the full protection of the patient. We feel compelled to agree with appellants that the State must show more than it has in order to prove that only the full resources of a licensed hospital, rather than those of some other appropriately licensed institution, satisfy these health interests.

Notwithstanding the Supreme Court's explication of the appropriate criteria for determining the constitutionality of the Virginia statute, the state trial court summarily denied the doctor's defense. The judge said: "I am certainly not going to go further than the Supreme Court, than I believe the Supreme Court has gone at this point." The judge then observed that one hospital in the community permitted second trimester abortions. The evidence, however, disclosed that this hospital imposed an absolute requirement for a minor's parental consent. The judge made no reference to this evidence and did not rule on the claim that this requirement administered in conjunction with the statute raised a question of the statute's constitutionality. *See, e. g., Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 483 F.Supp. 679, 687 (W.D.Mo. 1980).

The judge added: "Furthermore, from the evidence I have heard, I frankly believe that the regulations that the Virginia Legislature has imposed on second trimester abortions are reasonably related to maternal health and are not unconstitutional in any way." Just before he sentenced the doctor, the judge commented, "I look at your case as really one where you were doing that which you had a legal right to do, but you weren't following what I consider legitimate regulations handed down by the legislature of Virginia."

In reaching his conclusion that the Virginia statutes are constitutional, the judge did not advert to any of the evidence. He made no findings about the factual criteria prescribed by the Supreme Court in *Bolton*.

After the doctor was found guilty, his license was revoked without a hearing pursuant to Va.Code § 54–321.2, which mandates revocation or suspension when a physician is convicted of any felony. As allowed by this statute, the doctor applied to the State Board of Medicine for a hearing and reinstatement of his license pending appeal.

The Board granted the doctor a hearing 56 days after his license was revoked. Again the doctor presented evidence from expert witnesses in support of his claim that the procedures he followed in his clinic were acceptable medical practice and that hospitalization was unnecessary to safeguard the patient's health. The doctor gave assurances that pending his appeal he would not undertake the procedures for which he was convicted.

The Board retired to executive session, and upon its return to public session took a recorded vote. Nine members of the Board voted to reinstate the doctor's license; four voted against. Because reinstatement requires a vote of three-fourths of the members in attendance, it failed to carry by a fraction of one vote.

Although the statute requires the Board to consider the likelihood of irreparable harm to the physician, the risk of injury to patients or the public, and the seriousness of the offense, the Board made no findings on these issues either orally or in writing. Furthermore, it made no findings with respect to the relative safety of abortions performed in a hospital and those performed in the doctor's outpatient clinic. Instead, the Secretary of the Board simply notified the doctor that after consideration of the evidence "it was the decision of the Board that your request for termination of revocation of your license to practice medicine in Virginia, pending appeals, be denied." No reasons for this decision were disclosed.

While this federal appeal was pending, the doctor filed a timely petition for review of the Board's action in the appropriate state court.

### III

The due process clause protects a physician's property interest in his professional

license. *See Barry v. Barchi*, 443 U.S. 55, 64, 99 S.Ct. 2642, 2649 (1979); *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). I agree with the majority opinion that the doctor's right to due process was not offended because his license was initially revoked without a hearing. *Barry v. Barchi*, 443 U.S. at 64–65, 99 S.Ct. at 2648–49; *Mackey v. Montrym*, 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979); *accord Christhilf v. Annapolis Emergency Hospital Ass'n.*, 496 F.2d 174, 180 (4th Cir. 1974).

*Barry*, however, couples its approval of prehearing revocation with the admonition that the state must furnish the licensee with a "prompt judicial or administrative hearing that would definitely determine the issues...." 443 U.S. at 64, 99 S.Ct. at 2649. In the absence of an explanation by the state that compelling reasons caused the delay, I would hold that a lapse of 56 days between summary revocation and a hearing does not satisfy the due process clause's requirement for a prompt postrevocation hearing when a physician's license is at stake. I find it unnecessary, however, to base my dissent solely on the application of the revocation statutes to the doctor's situation. *Barry* indicates that the denial of procedural due process is more deeply rooted.

In *Barry* the statute providing for an administrative postrevocation hearing made no provision for a prompt hearing. The district court declined to abstain to await state interpretation of the statute and granted relief. The Supreme Court affirmed part of the district court's order,

holding that the licensee's suspension was unconstitutional "for lack of assurance of a prompt postsuspension hearing." 443 U.S. at 68, 99 S.Ct. at 2651.

Conversely, in *Mackey v. Montrym*, 443 U.S. 1 (1979), a statute mandating prehearing suspension of a driver's license was held to be constitutional because it afforded the licensee a prompt—indeed an immediate—postsuspension hearing.

Here, as in *Barry*, and unlike the situation in *Mackey*, a Virginia physician has no assurance of a prompt postrevocation hearing. The statute provides that a physician whose license has been summarily revoked "shall be entitled to a hearing not later than the regular meeting of the Board next following the expiration of ten days from the receipt of such application...." Va. Code § 54–321.2. The statute governing meetings of the Board requires "not less than one regular meeting a year."[2]

We have been told that the Board customarily meets three times a year. But this custom affords no assurance to a physician that he will receive a prompt postrevocation hearing for it lacks the mandate of the statute.[3] Moreover, by the express provision of § 54–321.2, a physician whose license is summarily revoked nine days before a regular meeting must await 100 days for his mandatory postrevocation hearing.

Therefore, applying the principles explained in *Barry* and *Mackey*, I conclude that the lack of assurance of a prompt postrevocation hearing, as well as the actual lapse of 56 days, deprived the doctor of his property interest in his license without procedural due process of law.

**2.** Va.Code § 54.290 provides:
  Regular meetings of the Board shall be held at such times and places as the Board shall prescribe, and special meetings may be held upon the call of the president and any eight members, but there shall be not less than one regular meeting each year. Nine members of the Board shall constitute a quorum.

**3.** The statute makes no provision for a mandatory expedited hearing, although in its discretion the Board can convene a special meeting upon the call of the president and eight members. Va.Code §§ 54–321.2 and 54–290. The Board was polled in mid-June, but a quorum

was not obtained for a special meeting. The district court found that the doctor had not made formal application for a hearing, but that as a result of a telephone call from the doctor's counsel, the Board scheduled a hearing on July 18. This was the date of the next regular meeting of the Board. The doctor's brief states that this call was made in April and the Board declined to schedule an earlier hearing. Because the district court made no findings about the date of the telephone call and its contents, I believe it would be improper to rely on this incident as a basis of decision.

## IV

The doctor's right to procedural due process of law was abridged for an independent reason. The due process clause requires an administrative agency to state the findings that undergird its order and the reasons for its decision. *Vitek v. Jones*, 445 U.S. 480, 495–96, 100 S.Ct. 1254, 1264–65, 63 L.Ed.2d 552 (1980); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 432, 55 S.Ct. 241, 253, 79 L.Ed. 446 (1935). In *Wolff v. McDonnell*, 418 U.S. 539, 564, 94 S.Ct. 2963, 2978, 41 L.Ed.2d 935 (1974), the Court held that "there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action" meted out to a prisoner. We recently emphasized this principle in *Franklin v. Shields*, 569 F.2d 784, 801 (4th Cir. 1977), where speaking of parole hearings we said: "[A]t the present time the only explicit constitutional requisite is that the Board furnish to the prisoner a statement of its reasons for denial of parole."

The Board did not adhere to this elemental precept of procedural due process. One would not expect the Board to issue an opinion on the constitutionality of the abortion statutes. But because of the expertise of some of its members, it is admirably fitted to make factual findings about the inquiries the Virginia statute requires it to consider.[4] In the context of this case, these findings would also encompass the factual criteria that the Supreme Court has said are essential for determining the constitutionality of an abortion statute. As pointed out in Part II of this opinion, the Board made no findings whatsoever and issued no opinion. Without furnishing any reasons, the Board simply announced that it would not terminate the summary revocation of the doctor's license.

In most instances, the Board could probably rely on the judgment of the state trial court when a physician has been convicted of a felony, and it could incorporate by reference the record of the state criminal trial in its decision. Here the Board did not even do that. Moreover, as pointed out in Part II, the record of the criminal trial is deficient, for the state court made none of the evidentiary findings essential to determine whether the abortion statutes are constitutional.

The doctor's challenge of the constitutionality of the Virginia abortion statutes is not frivolous.[5] Nevertheless, his license has been revoked despite the fact that no state tribunal, either judicial or administrative, has made the factual findings essential for deciding whether the statutes he violated are constitutional. Furthermore, the Board gave no reasons for its action.

Accordingly, I conclude that the doctor's license has been revoked without any state tribunal according him the procedural due process of law required by *Vitek v. Jones*, 445 U.S. 480, 495–96, 100 S.Ct. 1254, 1264–65, 63 L.Ed.2d 552 (1980); *Wolff v. McDonnell*, 418 U.S. 539, 564–65, 94 S.Ct. 2963, 2978–79, 41 L.Ed.2d 935 (1974); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 432, 55 S.Ct. 241, 253, 79 L.Ed. 446 (1935), and *Franklin v. Shields*, 569 F.2d 784, 801 (4th Cir. 1977).

## V

The state also contends that abstention is required because review of the Board's action by a state court will satisfy the requirements of the due process clause. I cannot accept this argument.

The doctor has exhausted his administrative remedies. Because of the lack of assurance of a prompt postrevocation hearing and the failure of the Board to state any

---

4. Most of the members of the Board are medical doctors. Serving with them are an osteopath, a podiatrist, a chiropractor, and a clinical psychologist. Va.Code § 54–284.

5. The constitutional question, which the doctor raised, has not yet been definitively resolved. Two federal courts have held that state statutes requiring hospitalization for second trimester abortions are unconstitutional. *Margaret S. v. Edwards*, 488 F.Supp. 181, 191–96 (E.D.La. 1980); *Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 483 F.Supp. 679, 685–87 (W.D.Mo.1980); *contra, Wynn v. Scott*, 449 F.Supp. 1302, 1317, 1318 (N.D.Ill.1978), *appeal dismissed*, 439 U.S. 8, 99 S.Ct. 49, 58 L.Ed.2d 7, *aff'd* 599 F.2d 193 (7th Cir. 1979).

reasons for its action, these remedies have not afforded the doctor procedural due process. Under these circumstances, I believe the principles explained in *Gibson v. Berryhill*, 411 U.S. 564, 577, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973), are applicable. Although the facts of that case differ from those before us, its rationale cannot be put aside. *Gibson* teaches that when a licensee is denied procedural due process by an administrative agency, abstention is not required simply because the licensee can seek judicial review of the administrative action, *de novo* or otherwise.[6] I think *Gibson* is dispositive, but because the point is pressed, I add the following observations.

If the doctor is relegated to the state reviewing court for a determination of the reasons why his license should, or should not, be restored, it is apparent that this forum would afford the only significant postrevocation hearing provided by the state. But such review cannot be sought until after the administrative hearing. The inordinate lapse of time between summary revocation and completion of review would not satisfy the requirements of *Barry v. Barchi*, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), and *Mackey v. Montrym*, 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979), for a prompt postrevocation hearing.

Furthermore, the total absence of findings and statement of reasons for the Board's action render doubtful the utility of reviewing the administrative proceedings. Cf. *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 92–95, 63 S.Ct. 454, 461–62, 87 L.Ed. 626 (1943). A remand by the reviewing court to the Board to correct these deficiencies would not comport with the requirement of a prompt postrevocation hearing.

*Huffman v. Pursue*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), and *Scruggs v. Campbell*, 630 F.2d 237 (4th Cir. 1980), do not support the state's position. Neither of these cases require abstention with respect to the doctor's procedural due process claims. The complainant in *Huffman* had litigated a substantive challenge to the constitutionality of a state statute in a state court. Dissatisfied, he sought to relitigate the same substantive question in federal court. The case did not involve, as here, proof that the state remedies were procedurally defective. *Huffman* is pertinent to that portion of the doctor's complaint that sought a judgment declaring the abortion statutes unconstitutional—an aspect of this case in which I agree that abstention is proper. It did not involve, however, any claim that the state proceedings deprived the claimant of his property without affording him procedural due process of law.

*Scruggs* also misses the mark. There a federal statute allowed the party aggrieved by an administrative decision to seek review in either state or federal court. Applying this statute when the aggrieved party had petitioned the state court, we held that the other party could not bifurcate review or forestall state review by commencing a federal suit before the administrative proceedings were completed. By the terms of the statute, one judicial forum was sufficient. 630 F.2d at 238–39.

*Rucker v. Wilson*, 475 F.Supp. 1164 (E.D. Mich.1979), is also distinguishable. In *Rucker* the doctor's license had not been summarily revoked without a hearing. The question before the medical board was whether his license should be revoked. The delay in the board's proceedings did not deprive him of a property interest because, pending resolution by the board of the complaints against him, he was entitled to practice his profession. The absence of a prehearing revocation in *Rucker* is the critical factual distinction between that case and the one we are considering. If in *Rucker*, as here, the doctor's license had been summarily revoked and he was not assured a prompt postrevocation hearing before the board, the principles explained in *Barry v. Barchi*, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), would have afforded him relief in a federal court because he had been deprived of his property interest in his license without procedural due process of law.

6. The pertinent text of *Gibson* is quoted, *supra*, in Part I.

## VI

Finally, in addition to the legal issues involved in this case, there remain equitable considerations concerning the relief which the doctor seeks. These involve weighing the interests of the state in protecting and vindicating the public interest against the harm that a physician suffers by revocation of his professional license. Although the harm to the doctor is substantial, the principal factor to be considered is the likelihood of endangering the public if he is permitted to practice pending his appeal to the Supreme Court of Virginia.

The record discloses the following facts. The doctor is a Diplomate of the American Board of Obstetrics and Gynecology and a Fellow of the American College of Obstetricians and Gynecologists. He has given assurances that pending appeal of his conviction he will not undertake the outpatient procedures for which he was prosecuted. At the conclusion of the state trial, the prosecutor described the doctor's violation of the abortion statutes as "victimless activity" and recommended a suspended sentence with community service. The judge, who also was aware of the nature of the doctor's culpability, stated that while he had no control over the license and took no position concerning it, "If they determine that you should keep your license, that would be fine with me."[7] The two hospitals where the doctor practiced filed answers in this action stating that his staff privileges would be reinstated if his license were restored. Nine of the fourteen members of the Board voted to reinstate his license.

These facts persuade me that there is no showing of likelihood of danger to the public if the doctor is permitted to practice pending his appeal. Accordingly, I would remand this case to the district court with directions to grant an injunction restraining revocation of the doctor's license pending appeal of his conviction to the Supreme Court of Virginia, conditioned on his compliance with the Virginia statutes pertaining to abortions.

---

7. The punishment imposed by the judge would not have prevented the doctor from continuing his practice. The court suspended a two-year sentence, ordered him confined to the county jail for 30 days to be served on weekends, and placed him on inactive probation for two years. Execution of the sentence was suspended pending appeal.