Alice T. PHILLIPS, M.D., Plaintiff,

v.

VIRGINIA BOARD OF MEDICINE, and Virginia Department of Health Professions, and Bernard L. Henderson, Jr., Director, Virginia Department of Health Professions, and Hilary H. Connor, M.D., Executive Director, Virginia Board of Medicine, Defendants.

Civ. A. No. 90–1007–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 1, 1990.

Victor M. Glasberg, Jeanne Goldberg, Victor M. Glasberg & Associates, Alexandria, Va., for plaintiff.

Mary Sue Terry, Atty. Gen., Jessica Sanders Jones, Sr. Asst. Atty. Gen., Howard M. Casway, Lynne R. Fleming, Asst. Attys. Gen., Office of the Attorney General, Richmond, Va., for defendants.

MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

This suit by a psychiatrist to enjoin the State of Virginia from revoking her medical license raises an unsettled question under the *Younger* abstention doctrine.[1] Plaintiff, a Virginia resident, is licensed by the Virginia Board of Medicine (the "Board") to practice psychiatry in the Commonwealth. She seeks injunctive relief in this Court to save her medical license, alleging that the Board's revocation decision was unconstitutionally based on plaintiff's belief in, and practice of, fundamentalist Christianity. The Board, as a threshold matter, urges the Court to abstain from consideration of plaintiff's federal constitutional claim pursuant to the *Younger* abstention doctrine and to dismiss plaintiff's complaint. Alternatively, the Board seeks dismissal or summary judgment, arguing that its revocation of plaintiff's license is not infected with any unconstitutional considerations and rests instead on facts, independent of plaintiff's religious beliefs, that demonstrate plaintiff's unfitness to practice medicine. Plaintiff responds that *Younger* is inapplicable here and that the Board's action is flagrantly unconstitutional.

For the reasons set forth here, the Court concludes that *Younger* and its progeny counsel abstention where, as here, a plaintiff files a federal court constitutional challenge to an ongoing state enforcement proceeding. The Court therefore abstains from deciding the constitutional claim presented here and dismisses plaintiff's complaint without prejudice.

### Facts & Proceedings

Plaintiff is a board-certified psychiatrist who terms herself a "born again" fundamentalist Christian. Until July 24, 1990, plaintiff was licensed to practice psychiatry in Virginia.

Four defendants are named. They are (i) the Board, (ii) the Virginia Department of Health Professions (the "Department"), (iii) Bernard L. Henderson, Jr., the director of the Board, and (iv) Hilary Connor, M.D., the director of the Department.[2] Defendants are state agencies and individuals charged with the licensure of medical doctors in Virginia.

In March 1989, by written notice, the Board advised plaintiff of certain charges against her, including (i) the inappropriate introduction of religious themes and modalities into her psychiatric work with three of her patients, (ii) the improper maintenance of simultaneous religious as well as professional relationships with patients from 1986 through 1988, and (iii) impermissible self-prescription of certain controlled medications. Thereafter, on May 18, 1989, before a panel consisting of defendants' agents, an informal hearing was conducted. At that hearing, plaintiff was represented by counsel, and she acknowledged in her opening statement that she had overstepped the proper line of demarcation between her private religious beliefs and her professional responsibilities as a psychiatrist. She informed the Board that she would immediately conform her practice to professional standards in that regard.

In September 1989, plaintiff received a second notice advising her of charges essentially identical to those in the March 1989 notice. Pursuant to that notice, another informal hearing was conducted in October 1989. Again, plaintiff was represented by counsel, and she acknowledged the inappropriateness of her behavior and expressed her desire and intention to conform her psychiatric practices to professional standards. At that time, the Board proposed that plaintiff enter into a consent order subjecting her to certain supervisory conditions, but fully preserving her right to retain her license and practice psychiatry. Plaintiff declined to accept the consent order and instead requested a formal review of her case. Pursuant to plaintiff's request, the Board ordered a formal hearing before a hearing officer. At that hearing,

---

**1.** *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

**2.** The individual defendants are being sued in their official capacities.

plaintiff, as she had at the two prior informal proceedings, expressly stipulated that her introduction of religious themes into her therapeutic work had been inappropriate and that she had ceased such behavior and would henceforth strictly adhere to the November 1989 American Psychiatric Association's Guidelines governing religion and psychiatry.

On June 29, 1990, the hearing officer issued his written decision in plaintiff's case. The officer found that plaintiff had violated several provisions of the laws governing the conduct and licensure of doctors in Virginia, a conclusion that plaintiff does not dispute.[3] One of those provisions states that a practitioner "shall be considered guilty of unprofessional conduct if he ... [i]s unable to practice with reasonable skill or safety because of illness or substance abuse." § 54.1–2914.A.11. The hearing officer determined that this provision had been violated, and stated in his report:

> The rationale that § 54.1–2914.A.11. is violated, is premised on the conclusion that respondent's acts were influenced by her seasonal mood disorder, the medications taken therefore, and/or that her extreme, aberrant (cockamamy) religious beliefs and practices evidence illness.

Hearing Officer's Decision, June 29, 1990, at 111–12. Later in the decision the hearing officer again stated his view that plaintiff's "extreme, aberrant religious beliefs and practices evidence illness" that rendered her unfit to practice medicine and thus in violation of Va.Code § 54.1–2914.A.11. *Id.* at 114.

Plaintiff appealed the hearing officer's decision to the Board, which conducted formal hearings on July 21 and 22, 1990. Plaintiff was again represented by counsel at these hearings. On July 23, 1990, the Board orally announced its decision to re-

voke plaintiff's license. On July 25, 1990, plaintiff filed with this Court her Complaint and a Motion for Temporary Restraining Order ("TRO"), seeking to restrain the Board from issuing an order revoking plaintiff's license. On July 27, 1990, defendants filed a Motion to Deny plaintiff's request for a TRO and a Motion to Dismiss plaintiff's complaint.

This matter came before the Court on July 27, 1990, on the parties' motions. Both parties, having received notice of the hearing, appeared by counsel. At oral argument, the Court determined that events had overtaken plaintiff's request for a TRO, as the Board, by Order dated July 24, 1990, had already revoked plaintiff's medical license. Thus, the Court denied plaintiff's request for a TRO as moot and took defendant's Motion to Dismiss under advisement. Because the Board had previously offered to enter into a consent order with plaintiff, the Court directed the parties to meet, confer and attempt to resolve the matter and to advise the Court, not later than August 10, 1990, of the results of their efforts. Subsequently, the parties advised the Court of their inability to reach an agreement. Accordingly, defendant's Motion to Dismiss came again before the Court.

On or about September 11, 1990, plaintiff filed an appeal of the Board's decision with the Circuit Court of Prince William County. In that filing, plaintiff expressly stated that she reserved her federal constitutional claim for consideration by this Court. A hearing in the state court on plaintiff's petition for appeal is apparently scheduled for November 1, 1990.[4] During the month of October, the parties filed numerous additional motions pertaining to this matter. On October 24, 1990, the Court by order dismissed plaintiff's complaint for the rea-

---

**3.** The Hearing Officer concluded that the following Virginia statutory provisions had been violated: § 54.1–2915.A.3. (unprofessional conduct), –2915.A.4. (gross carelessness or malpractice), § 54.1–2914.A.9. (conduct of practice contrary to professional standards of relevant branch of medicine), –2914.A.10. (conduct of practice in manner dangerous to health of pa-

tient), –2914.A.11. (inability to practice with skill or safety because of illness or substance abuse), § 54.1–3303 (prescription of controlled substance for non-medicinal and non-therapeutic purpose), and § 54.1–3408 (same).

**4.** Defendant's Supplemental Motion to Dismiss on Abstention Grounds at 2.

sons stated in the order and to be set forth in this memorandum opinion.

## Analysis

Analysis properly begins with a review of *Younger* and its progeny, including *Middlesex*,[5] tracing the extension of *Younger* to state administrative enforcement proceedings of a judicial nature. Next, the *Middlesex* test is applied to determine whether the revocation proceedings here at issue qualify for application of *Younger*. Finding that the revocation proceedings do qualify, the Court further considers whether the proceedings are still "ongoing" for purposes of *Younger*. Concluding both that the proceedings are still pending and that no exceptions to *Younger* apply, the Court abstains and dismisses plaintiff's complaint without prejudice.

### I. *Younger* and Its Progeny

In *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that a federal court should not enjoin an ongoing state criminal proceeding, except in the very unusual situation where an injunction is necessary to prevent immediate, irreparable injury.[6] In *Younger*, the appellee, John Harris, Jr., had been indicted and charged with violating a section of the California Criminal Syndicalism Act. While the prosecution was pending, Harris filed suit in federal district court requesting the court to enjoin the District Attorney of Los Angeles County from proceeding against him. A three-judge federal district court held that California's Criminal Syndicalism Act violated the First and Fourteenth Amendments, and accordingly enjoined further prosecution of Harris. *Id.* at 38–40, 91 S.Ct. at 747–48. The Supreme Court held that the district court judgment "must be reversed as a violation of the national policy forbidding federal courts to stay or enjoin pending

state court proceedings except under special circumstances." *Id.* at 41, 91 S.Ct. at 749. In reaching this conclusion, the Court noted two primary sources of what it termed the "long-standing public policy against federal court interference with state court proceedings." *Id.* at 43, 91 S.Ct. at 750. The first source concerns principles of equity:

> One [primary source] is the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.

*Id.* at 43–44, 91 S.Ct. at 750.

The Court observed further that considerations of equity were "reinforced by an even more vital consideration, the notion of 'comity,'" which the Court described as

> a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

*Id.* at 44, 91 S.Ct. at 750. Principles of equity and comity explain "why it has been perfectly natural for our cases to repeat time and time again that the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Id.* at 45, 91 S.Ct. at 751.

Although originally applied in the context of a pending state criminal proceeding, the concern for comity expressed in *Younger* has been applied by the Supreme Court in the context of certain other types of pending state proceedings. Thus *Younger* has been applied in a variety of

---

**5.** *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).

**6.** On the same day, the Supreme Court also issued *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971) (extending the

*Younger* abstention doctrine to requests for declaratory relief arising out of ongoing state criminal prosecutions), and *Dyson v. Stein*, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971) (extending *Younger* abstention from "ongoing" to "pending" state criminal prosecutions).

civil proceedings in which a state sought to vindicate important interests. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (vacating three-judge district court's order enjoining state civil nuisance proceeding, based on obscenity claims, against theater); *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (holding that three-judge district court should have refrained from interfering with civil contempt proceeding arising in action to collect judgments); *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (holding that district court erred in enjoining civil enforcement action brought by state to retrieve welfare payments); *Moore v. Sims*, 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979) (holding that district court should have abstained from interfering with pending state child custody proceeding).

*Younger* has also been held to apply in the context of state administrative proceedings seeking to vindicate important state interests, provided that the federal plaintiff has a full and fair opportunity to litigate his federal constitutional claims in the state proceedings. *Middlesex County Ethics Committee v. Garden State Bar Assn.*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (upholding district court's application of *Younger* abstention to pending state bar disciplinary proceeding); *Ohio Civil Rights Commission v. Dayton Christian Schools*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (holding that district court erred in entering judgment and dismissing complaint; rather, *Younger* abstention applied to ongoing administrative proceedings before state Civil Rights Commission). Moreover, on two occasions the Supreme Court has indicated, without expressly holding, that the *Younger* doctrine of abstention generally applies to ongoing state administrative proceedings to revoke medical licenses. *See Geiger v. Jenkins*, 401 U.S. 985, 91 S.Ct. 1236, 28 L.Ed.2d 525 (1971); *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).[7]

The Supreme Court in *Middlesex* held that abstention was required in a case brought in federal court to enjoin a state bar disciplinary proceeding on federal constitutional grounds. In reaching this result, the Court set forth a three-part test to determine when the *Younger* abstention doctrine applies to a state administrative

---

7. In *Geiger*, the Supreme Court summarily affirmed without opinion, but with citation to *Younger* and *Samuels v. Mackell*, a lower court opinion, *Geiger v. Jenkins*, 316 F.Supp. 370 (N.D. Ga.1970), in which the district court refused to enjoin an ongoing state administrative revocation proceeding before the Georgia Board of Medical Examiners. 401 U.S. 985, 91 S.Ct. 1236. The district court, in an opinion written before the Supreme Court issued *Younger*, held that the Georgia statute regulating license revocation proceedings was penal in nature, and that revocation proceedings should be likened to state court criminal proceedings. The district court therefore concluded that the anti-injunction statute, 28 U.S.C. § 2283, which prohibits federal courts from enjoining proceedings in a state court except where expressly authorized by act of Congress or where necessary in aid of the court's jurisdiction, precluded the grant of either declaratory or injunctive relief. 316 F.Supp. at 372. The Supreme Court affirmed, citing *Younger* rather than 28 U.S.C. § 2283. Because the affirmance was without opinion, it is not clear whether the Supreme Court found that *Younger* generally applies to state medical license revocation proceedings, or that *Younger* applies only where the applicable state statutes regulating the revocation proceedings indicate

that the proceedings are penal in nature. Given the subsequent Supreme Court opinions in *Middlesex County* and *Ohio Civil Rights Commission*, *Younger* appears applicable whenever state administrative proceedings are "judicial" in nature.

In a second, early case, issued shortly after *Younger*, *Gibson v. Berryhill*, 411 U.S. 564, 578, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973), the Supreme Court approved the decision of a three-judge district court to enjoin unprofessional conduct proceedings before the Alabama Board of Optometry where the facts showed that board members' pecuniary interests disqualified them from passing on the issues. However, the Supreme Court vacated the lower ruling for reconsideration in light of a subsequent Alabama Supreme Court opinion. In *Gibson*, the Supreme Court stated that "it is apparent ... that administrative proceedings looking toward the revocation of a license to practice medicine may in proper circumstances command the respect due court proceedings...." 411 U.S. at 576–77, 93 S.Ct. at 1697. Because it found the optometry board to be biased, however, the Supreme Court did not reach the issue of what conditions must prevail to render medical license revocation proceedings due the respect accorded court proceedings.

proceeding. The test, in the Court's words, is as follows:

> *first,* do state bar disciplinary hearings within the constitutionally prescribed jurisdiction of the State Supreme Court constitute an ongoing state judicial proceeding; *second,* do the proceedings implicate important state interests; and *third,* is there an adequate opportunity in the state proceedings to raise constitutional challenges.

457 U.S. at 432, 102 S.Ct. at 2521. *See Watts v. Burkhart,* 854 F.2d 839, 846 (6th Cir.1988) (applying "the three pertinent factors emphasized in *Middlesex*"). With respect to the second and third factors, the Court found that New Jersey had "an extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses," 457 U.S. at 434, 102 S.Ct. at 2522, and that any constitutional issues raised in reviews conducted by the state's local District Ethics Committees could be appealed to the Supreme Court of New Jersey. 457 U.S. at 435–37, 102 S.Ct. at 2523–24. Hence, parts two and three of the test were satisfied.

The first requirement—namely that a state administrative proceeding "constitute an ongoing state judicial proceeding"—was satisfied in *Middlesex* based on several findings. Significant among these findings were that the state constitution vested authority in the New Jersey Supreme Court to enforce professional discipline among members of the bar, and that the disciplinary proceedings were "judicial in nature," as they were initiated by filing a complaint with an ethics and grievance committee. 457 U.S. at 433–34, 102 S.Ct. at 2522.

■ A state administrative proceeding need not relate to state bar disciplinary matters nor be conducted by boards directly created by a state's supreme court to qualify as "judicial in nature." In *Ohio Civil Rights Comm'n v. Dayton Christian*

*Schools,* 477 U.S. at 628–29, 106 S.Ct. at 2723–24, the Supreme Court held that employment discrimination proceedings conducted before the Ohio Civil Rights Commission were "judicial in nature," apparently because the proceedings, conducted before an administrative body created by statute, were formal and adversarial, and were subject to judicial review in state court. *Cf. Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) (holding that district court was not required to abstain where state statute expressly indicated that administrative arbitration proceedings were not part of, and were not themselves, a judicial proceeding). In sum, *Middlesex* and *Dayton* teach that enforcement proceedings conducted before various types of state administrative agencies, if conducted in a trial-like manner and subject to state judicial review, may qualify as "judicial in nature" for purposes of applying *Younger* abstention. The next question is whether the revocation proceeding here at issue satisfies the *Middlesex* test.

## II. Applying *Middlesex* to Virginia's Revocation Procedure

■ For *Younger* abstention to apply, the medical license revocation proceeding at issue must be shown to be a state administrative proceeding that (i) is judicial in nature, (ii) vindicates an important state interest, and (iii) provides for resolution of plaintiff's federal constitutional claims. In concluding that these conditions are met, the Court relies not only on the Supreme Court cases discussed above, but also on several lower court cases applying *Younger* in the context of medical license revocations,[8] and cases from this circuit that, while not directly addressing the applicability of *Younger* to medical revocation proceedings, point persuasively to the application of *Younger* here.[9]

---

8. *See, e.g., Watts v. Burkhart,* 854 F.2d 839 (6th Cir.1988) (revocation of physician's license); *Allen v. Louisiana State Board of Dentistry,* 835 F.2d 100 (5th Cir.1988) (revocation of dental license).

9. In the pre-*Middlesex* case of *Simopoulos v. Virginia State Bd. of Medicine,* 644 F.2d 321

(4th Circuit 1981), for example, the Fourth Circuit upheld the district court's abstention under *Younger* and dismissal of a complaint charging that the Board violated the due process clause of the Fourteenth Amendment when it revoked,

## A. *Judicial in Nature*

■ The Board's status and structure and its license revocation criteria and procedures confirm the judicial nature of the revocation proceedings here at issue. The Board and the revocation procedures it follows are established by statute. Va.Code § 54.1–2911 establishes how members of the Board are selected, their terms in office, and other matters. Actions constituting unprofessional conduct are set forth in Va.Code § 54.1–2914, and § 54.1–2915 authorizes the Board to "revoke any certificate or license" for any of several causes, including:

3. Unprofessional conduct as defined in this chapter; [and]

4. Gross ignorance or carelessness in his practice, or gross malpractice.

The Board relied on both of these justifications for its action here. Significantly, the Board's revocation procedures are manifestly formal and adversarial and, as such, "judicial in nature." [10] In the instant case,

the full panoply of proceedings and safeguards provided for by the Virginia Administrative Process Act operated.[11] Given all this, there can be little doubt that the administrative revocation proceedings at issue are "judicial in nature."

## B. *Vindication of Important State Interest*

■ The plaintiff in this case was found by the Board to have prescribed or dispensed a "controlled substance with intent or knowledge that it will be used otherwise than medicinally, or for accepted therapeutic purposes," in violation of Va.Code § 54.1–2914.3, to have conducted her practice "in a manner contrary to the standards of ethics of [her] branch of the healing arts," violating § 54.1–2914.9, to be "unable to practice with reasonable skill or safety because of illness or substance abuse," in violation of § 54.1–2914.11, and to have committed other violations of the Virginia Code. It is difficult to imagine a state interest more important than the pro-

prior to a hearing, plaintiff's license because of plaintiff's criminal conviction for violating certain anti-abortion statutes. The Fourth Circuit found that the statute under which the Board revoked plaintiff's license "was clearly enacted in aid of and for the purpose of facilitating the standards established in the state abortion statute," and so the revocation proceedings were "quasi-criminal" in nature and qualified for abstention under *Huffman v. Pursue's,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 extension of *Younger* to civil proceedings of a "quasi-criminal" nature.

**10.** Section 54.1–2920 of the Va.Code provides that "[t]he Board shall take no action to revoke or suspend the license of any of its licensees except after reasonable notice and opportunity to be heard in accordance with the Administrative Process Act (§ 9–6.14:1 *et seq.*)." The provisions of Virginia's Administrative Process Act establish elaborate procedures of a judicial nature through which agencies must act when they "decide cases." Va.Code § 9–6.14:3. Agencies are directed to "ascertain the fact basis for their decisions of cases through informal conference or consultation proceedings" designed to reach a settlement of matters if possible. Va.Code § 9–6.14:11. If no settlement is reached and an agency's basic law requires a determination to be made after hearing (*see* Va.Code § 54.1–2920, prohibiting the Medical Board from revoking a license without a hearing), the agency "shall afford opportunity for the formal taking of evidence upon relevant fact issues" as part of a

formal hearing before a "hearing officer" or other presiding officials. Va.Code § 9–6.14:12. Numerous trial-like procedures and safeguards apply to this formal hearing. *See* Va.Code § 9–6.14:12.C. In addition, the presiding officer at the formal hearing is required to recommend findings and a decision or "if the agency shall by its procedural regulations provide" make "findings and an initial decision ... subject to review or reconsideration by the agency on appeal to it as of right or on its own motion." Va.Code § 9–6.14:12.C.

**11.** An informal fact-finding panel created by the Board met with the plaintiff on May 18, 1989, and again in October 1989, in accord with § 9–6.14:11. Plaintiff was represented by counsel at these two conferences. At their conclusion, the panel recommended that plaintiff enter into a consent agreement. Plaintiff refused and sought a formal hearing before agents of the Board of Medicine. On June 4th and 5th, 1990, formal hearings were held before a hearing officer. Plaintiff was represented by counsel, and the procedural safeguards specified in Va.Code § 9–6.14:12.C. were available. The hearing officer issued a decision on June 29, 1990, recommending that plaintiff's license be revoked. At a formal hearing before the Board of Medicine held July 21–22, 1990, the Board adopted certain of the hearing officer's findings and conclusions and, on July 23rd, orally informed plaintiff that an order revoking her license would be forthcoming.

tection of citizens against the harms of unethical or incompetent practitioners of the healing arts. So it is that Virginia courts have long upheld the constitutionality of the state's regulation of medicine. *See Grosso v. Commonwealth*, 180 Va. 70, 21 S.E.2d 728 (1942); *Pickard v. Commonwealth*, 126 Va. 729, 100 S.E. 821 (1920). The Virginia Supreme Court has specifically upheld the state's ability to license physicians and regulate their practice as a valid exercise of the state's police power. *Grosso*, 21 S.E.2d at 730; *Goe v. Gifford*, 168 Va. 497, 191 S.E. 783 (1937); *State Dentists v. Gifford*, 168 Va. 508, 191 S.E. 787 (1937). Furthermore, states have traditionally been accorded leeway in adopting procedures to protect public health and safety. *Mackey v. Montrym*, 443 U.S. 1, 17, 99 S.Ct. 2612, 2620, 61 L.Ed.2d 321 (1979). In *Middlesex*, the Supreme Court recognized that states have an important interest in exercising control over the professional conduct of attorneys. For somewhat different, but equally powerful reasons, states have a vital interest in regulating the conduct of the medical professionals they license.[12] The second criterion of the *Middlesex* test is therefore met.

## C. *Opportunity to Litigate Constitutional Issues*

█ *Younger* abstention is not required where an ongoing state proceeding does not provide an opportunity for resolution of a party's federal constitutional claims. *Compare Middlesex*, 457 U.S. at 432, 435–36, 102 S.Ct. at 2521, 2523 (finding "adequate opportunity" to raise constitutional claims), *and Ohio Civil Rights Comm'n v. Dayton Christian Schools*, 477 U.S. at 627–28, 106 S.Ct. at 2722–23 (same), *with Steffel v. Thompson*, 415 U.S. 452, 462, 94 S.Ct. 1209, 1217, 39 L.Ed.2d 505 (1974)

(finding no ongoing state proceeding to serve as vehicle for vindicating federal plaintiff's constitutional rights), *and Gerstein v. Pugh*, 420 U.S. 103, 108 n. 9, 95 S.Ct. 854, 860 n. 9, 43 L.Ed.2d 54 (1975) (finding that the issue of the legality of a pretrial detention could not be raised in defense of a state criminal prosecution). Here, this opportunity exists.

Va.Code §§ 9–6.14:15 to 9–6.14:19 provide for judicial review in state courts of agency determinations. Section 9–6.14:16 provides that "[a]ny person … aggrieved by and claiming unlawfulness of *a case decision* … shall have a right to direct review thereof by an appropriate and timely court action against the agency … and the judgment of such courts of original jurisdiction shall be subject to appeal to or review by higher courts as in other cases unless otherwise provided by law." (Emphasis added.) Section 9–6.14:17 provides that a state court reviewing an agency action may consider issues of law, including "(i) accordance with *constitutional right, power, privilege, or immunity….*" (Emphasis added.) The Fourth Circuit has observed that § 9–6.14:17 contains "language patently broad enough to include [a] plaintiff's objection to [a] statute on constitutional grounds." *Simopoulos v. Virginia State Bd. of Medicine*, 644 F.2d at 330 n. 37. Consistent with this, the Supreme Court of Virginia, in *State Bd. of Health of Virginia v. Godfrey*, 223 Va. 423, 290 S.E.2d 875, 881 n. 6, noted that "the scope of review under the Virginia APA is 'virtually identical' to that in the Federal Administrative Procedure Act," *citing* Annual Survey of Virginia Law, 61 Va.L.Rev. 1632, 1639 (1975). Significantly, the plaintiff here has not claimed that she would be unable to raise her constitutional claim in an appeal to the Virginia courts, and defen-

---

**12.** *See Watts v. Burkhart*, 854 F.2d 839, 847 (6th Cir.1988) (finding "no reason to believe that states have any less vital an interest in controlling the professional conduct of state-licensed physicians" than of attorneys); *Allen v. Louisiana State Bd. of Dentistry*, 835 F.2d 100, 103 (5th Cir.1988) ("[a] state's interest in assuring the competency of dentists practicing within the state is unmistakably a significant state interest"); *Thomas v. Texas State Bd. of Medical*

*Examiners*, 807 F.2d 453, 455 (5th Cir.1987) (a state "possesses a great interest" in assuring the competency of physicians); *see also Williams v. Red Bank Bd. of Educ.*, 662 F.2d 1008, 1011 (3d Cir.1981) (state's interest in the competency of teachers "is precisely the sort of interest which the notions of comity and federalism, embodied in the *Younger* doctrine, command the federal courts to respect").

dants correctly point to Va.Code § 9–6.14:17 as proof that the claim can be considered on appeal by a Virginia court. As plaintiff's constitutional claim is reviewable in the state court on appeal, the requirement that there be "adequate opportunity" for a federal plaintiff to raise her claim in pending state proceedings is satisfied.[13]

Because opportunity to raise and resolve constitutional issues in state court exists, and because the administrative proceedings at issue are judicial in nature and were brought by the state to vindicate an important state interest, the three-part *Middlesex* test is largely met. Yet, one further issue must be addressed. For the *Middlesex* test to be satisfied, the administrative proceeding must "constitute an *ongoing* state judicial proceeding." 457 U.S. at 432, 102 S.Ct. at 2521. Given the specific posture of this case, a novel question is presented as to whether the state proceedings in issue are ongoing.

III. Whether State Proceedings are Ongoing

■ In the instant case, plaintiff requested this Court to take jurisdiction of her claim and to enjoin the revocation of her license by the Board at a point when proceedings before the Board were complete, and no state court appeal had been taken by plaintiff.[14] Subsequently, in part because of the passage of time during which this Court considered the parties' arguments on abstention and during which time plaintiff suffered from the inability to practice her profession, plaintiff appealed the Board's decision to Virginia's Prince William County Circuit Court. In doing so,

she expressly reserved her federal constitutional claim for review in federal court.

This procedural history presents two questions pertinent to the application of *Younger*. First, the court must consider whether a federal court may entertain a party's constitutional claims arising out of a state administrative enforcement proceeding at the juncture when administrative enforcement proceedings are complete, but an aggrieved party has not yet appealed the administrative decision to a state court. Put another way, the question is whether a party has a choice as to whether to bring its federal constitutional claims arising out of state administrative adjudicatory proceedings in federal court as opposed to pursuing these claims in the state court appeal. Second, if it is found that *Younger* and its progeny do not foreclose a federal court from entertaining claims raised by a party at the juncture in state proceedings just described, did the plaintiff's subsequent filing of a claim in state court, albeit with a reservation of her constitutional claim, trigger the operation of the *Younger* abstention doctrine. Because *Younger* and its progeny bar a federal court from entertaining a federal constitutional claim even when the claim is filed at the juncture in state proceedings just described, the Court need not, and does not, reach the second question.

On the first question, there is apparently conflicting authority. A recent Supreme Court opinion, in *dicta*, suggests that *Younger* applies to federal claims filed at the described juncture in state proceedings. *See New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S.

---

13. *See Ohio Civil Rights Commission,* 477 U.S. at 629, 106 S.Ct. at 2724 (holding that even if Ohio administrative Commission could not itself entertain constitutional claims, fact that state courts on appeal from Commission's decision could hear such claims satisfied *Middlesex* requirements); *Middlesex,* 457 U.S. at 435–36, 102 S.Ct. at 2523 (holding that any doubts about respondent's ability to have constitutional issues heard were laid to rest by state supreme court's entertaining the issues *sua sponte* ).

14. As noted, *supra,* on July 23, 1990, the Board orally informed plaintiff that it would revoke

her license and that a written order to that effect would issue. On July 25, 1990, plaintiff filed her complaint and motion for temporary restraining order ("TRO"). On July 27, 1990, the matter came before the Court. Because the Board had issued its written order on July 24, 1990, the Court denied the motion for a TRO as moot. Thus, when plaintiff filed her complaint, the Board had already taken final action; no state administrative proceedings remained to be completed, and no state court proceeding had been initiated.

350, 109 S.Ct. 2506, 2518 n. 4 and 2521, 105 L.Ed.2d 298 (Rehnquist, C.J., Blackmun, J., concurring) (1989). A prior Fifth Circuit opinion expressly holds the opposite. *Thomas v. Texas State Bd. of Medical Examiners*, 807 F.2d 453 (5th Cir.1987). In *New Orleans*, the Supreme Court did not have to decide the issue.[15] Even so, Justice Scalia, speaking for the majority, observed that some remarks in a prior decision "suggested, perhaps," that *Younger* applies to the juncture between state administrative judicial proceedings and relat-

ed state court appeals.[16] But the Court noted further that it had not yet ruled on whether a party may challenge a completed administrative action in federal court when an appeal of such action is available in state court.[17] In a separate concurrence, however, Chief Justice Rehnquist observed that in his opinion the Supreme Court's prior case law indicated that a state administrative proceeding "should be regarded as 'ongoing' for the purposes of *Younger* abstention until state appellate review is completed...." 109 S.Ct. at 2521.[18] Also, Jus-

---

**15.** In *New Orleans*, an electric utility sought to have a federal district court enjoin a utility rate decision issued by the New Orleans city council on grounds that the council's order was preempted by federal law under *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986) (which held that, for purposes of setting intrastate retail rates, a state may not differ from the Federal Energy Regulatory Commission's allocations of wholesale power by imposing its own judgment of what rates would be just and reasonable). The district court abstained, finding both the *Younger* and *Burford* doctrines of abstention applicable. The Supreme Court reversed, finding that neither doctrine applied. With respect to *Younger* abstention, the Court held that the ratemaking was legislative in nature, not judicial, and hence *Younger* was inapplicable.

The Court further found that under Louisiana's statutory scheme, the review given the council's ratemaking scheme by the state's courts would be judicial in nature, not legislative. In other words, the state courts were not authorized to reopen the council's determination and conduct a review of a legislative nature. The Court concluded that if the state's courts had been authorized to conduct proceedings of a legislative nature, then the district court would have been justified in abstaining on grounds of ripeness, for the council and state courts would have been engaged in a unitary legislative process that was not yet completed. Because the statutorily authorized state court review was judicial, rather than legislative, no unitary legislative process was at issue, and because the council's proceedings had been legislative and not judicial, no ongoing judicial proceeding could be asserted. The Court stated:

As a challenge to completed legislative action, NOPSI's [the utility's] suit represents neither the interference with ongoing judicial proceedings against which *Younger* was directed, nor the interference with an ongoing legislative process against which our ripeness holding in *Prentis* [*Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908)] was directed.

109 S.Ct. at 2520. The Supreme Court therefore concluded that the district court erred in abstaining.

**16.** The reference was to *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, 477 U.S. at 629, 106 S.Ct. at 2724, where the Supreme Court held that, for purposes of *Younger* abstention, there is "adequate opportunity" to have constitutional claims heard if such "claims may be raised in state-court judicial review of the administrative proceeding," even though the administrative body itself may not have authority to hear such claims. The Court in *New Orleans* observed that this "suggested, perhaps," that state administrative-judicial proceedings and related state court appeals should be viewed as one unitary judicial process for purposes of *Younger* abstention.

**17.** The Court's complete statement was as follows:

In *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), we held that the *Younger* doctrine prevented an injunction against an *ongoing* sex-discrimination proceeding before the Ohio Civil Rights Commission. The only other decision of ours arguably applying *Younger* to an administrative proceeding, *Middlesex County Ethics Comm. v. Garden State Bar Assn.*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982), similarly involved a situation in which the proceeding was not yet at an end. The fact that *Dayton Christian Schools* relied, as an alternative argument, upon the fact that the federal challenge could be made upon appeal to the state courts, see 477 U.S., at 629, 106 S.Ct., at 2724, suggests, perhaps, that an administrative proceeding to which *Younger* applies cannot be challenged in federal court even after the administrative action has become final. But we have never squarely faced the question.

109 S.Ct. at 2518–19 n. 4.

**18.** Chief Justice Rehnquist observed:

Nothing in the Court's opinion curtails our prior application of *Younger* to certain administrative proceedings which *are* "judicial in nature," see *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106

tice Blackmun, in a separate concurrence, expressed doubt that prior case law left open "the question whether abstention must continue through the judicial review process." *Id.*[19] At least two Justices, therefore, appear to have concluded that *Younger* should bar a federal court from entertaining a claim arising from state administrative proceedings of a judicial nature when a state provides for state court review of the administrative determination.

The Fifth Circuit decision stands in sharp contrast. It holds that abstention in these circumstances is not required. *Thomas v. Texas State Bd. of Medical Examiners,* 807 F.2d 453 (5th Cir.1987). This result was warranted, in the Fifth Circuit's view, because it found that comity concerns were not implicated under these circumstances and because it found applicable the general principle that one seeking in federal court to redress a deprivation of federal constitutional rights under 42 U.S.C. § 1983 need not first initiate state proceedings based on related state causes of action. 807 F.2d at 456.[20]

While there is much that is appealing about the *Thomas* decision, it is ultimately unpersuasive. To begin with, the result in *Thomas* rests in substantial measure on that court's effort to distinguish *Huffman v. Pursue,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1969). That effort is unconvincing. Plaintiff in *Huffman* instituted a § 1983 action in federal court after a state court trial, but before exhaustion of state appellate remedies. On these facts, the Supreme Court concluded that *Younger* applies to "federal intervention in a state judicial proceeding as to which a losing litigant has not exhausted his state appellate remedies." 420 U.S. at 609, 95 S.Ct. at 1211. The *Thomas* court distinguished *Huffman* on the grounds that the latter case rested largely on the ground of avoiding inefficiency in the use of state and federal courts, and on the assertion that comity concerns were not implicated when no proceedings of any nature had yet been held in state courts. 807 F.2d at 455–56. The first ground for distinguishing *Huffman* is insufficient because *Huffman* rests more squarely on considerations of comity than of efficiency. And while efficiency may well not have been a significant consideration under the facts in *Thomas,* various aspects of comity certainly were. These aspects support abstention as strongly here, and in *Thomas,* as they did in *Huffman.* For example, the Supreme Court in *Huffman* noted that allowing federal court intervention prior to the appeal suggests a lack of faith in state appellate courts:

> Virtually all of the evils at which *Younger* is directed would inhere in federal intervention prior to completion of state appellate proceedings.... Intervention at the later stage is if anything more highly duplicative ... and it is also a direct aspersion on the capabilities and good faith of state appellate courts.

*Huffman,* 420 U.S. at 608, 95 S.Ct. at 1210. The same may be said in this case: permitting plaintiff here to avoid the state court appellate process after trial-like proceedings at the administrative stage would cast

S.Ct. 2718, 91 L.Ed.2d 512 (1986); *Middlesex County Ethics Committee v. Garden State Bar Assn.,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); nor does it alter our prior case law indicating that such proceedings should be regarded as "ongoing" for the purposes of *Younger* abstention until state appellate review is completed, see *Dayton Christian Schools, supra,* 477 U.S., at 629, 106 S.Ct., at 2724. With this understanding, I join the portion of the Court's opinion holding that *Younger* abstention is inappropriate here. 109 S.Ct. at 2521 (Rehnquist, C.J., concurring).

19. ... I am not entirely persuaded that this Court's decisions applying *Younger* abstention

to administrative proceedings that are judicial in nature leave open the question whether abstention must continue through the judicial review process. *Ante,* at 2518, and n. 4. In my view, the majority's observations on these questions are not necessary to the result or the legal standard the majority has adopted. 109 S.Ct. at 2521 (Blackmun, J., concurring).

20. For cases holding that one seeking redress of a deprivation of a federal constitutional right in federal court under 42 U.S.C. § 1983 need not first initiate state proceedings based on related state causes of action, *see Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and its progeny.

"a direct aspersion on the capabilities and good faith" of Virginia's courts.

Yet additional comity concerns were raised by the Supreme Court in *Huffman* that were applicable in *Thomas* and are applicable here. Thus, the Court observed that failing to require exhaustion of appellate review once trial proceedings were held in state court would be disruptive of a state's efforts to vindicate interests it deems important:

> Nor ... is federal intervention at the appellate stage any the less a disruption of the State's efforts to protect interests which it deems important. Indeed, it is likely to be even more disruptive and offensive because the State has already won a *nisi prius* determination that its valid policies are being violated in a fashion which justifies judicial abatement.

*Huffman*, 420 U.S. at 608–09, 95 S.Ct. at 1210. Although the fit is not exact, this comity concern carries some weight here and in *Thomas*. Next, *Huffman* also rested on the following comity concern:

> Federal post-trial intervention, in a fashion designed to annul the results of a state trial, also deprives the States of a function which quite legitimately is left to them, that of overseeing trial court dispositions of constitutional issues which arise in civil litigation over which they have jurisdiction. We think this consideration to be of some importance because it is typically a judicial system's appellate courts which are by their nature a litigant's most appropriate forum for the resolution of constitutional contentions.

*Huffman*, 420 U.S. at 610, 95 S.Ct. at 1210–11. This consideration applies with equal force here. Such intervention "deprives the State" of the function of "overseeing" administrative adjudicatory dispositions of constitutional issues, or, more in keeping with the instant case, of overseeing and reviewing administrative adjudicatory processes to insure that unconstitutional considerations do not infect such processes.

Nor, it appears, is it any longer valid to claim that federal courts should be the exclusive arbiters of federal constitutional questions. The Supreme Court in *Younger*, and particularly in *Younger's* progeny, has maintained that state courts are to be treated as the equal of federal courts in reviewing federal constitutional issues.[21] In sum, the Fifth Circuit in *Thomas* does not adequately explain how the principle of comity, elucidated in *Huffman*, can be squared with permitting federal courts to entertain federal claims raised by parties at the juncture between state administrative proceedings and related state court appeal proceedings.

Also undercutting the persuasiveness of *Thomas* is its reliance on authorities that do not significantly support its conclusion. Four decisions are cited in support.[22] None involved a state administrative proceeding of judicial character. In two of the cases, *Patsy v. Florida Board of Regents* and *Monroe v. Pape*, no prior state administrative or state court proceeding had occurred before plaintiffs filed their § 1983 claims in federal court.[23] In the two remaining

---

**21.** *See Steffel v. Thompson,* 415 U.S. 452, 460–61, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974), citing *Robb v. Connolly,* 111 U.S. 624, 637, 4 S.Ct. 544, 551, 28 L.Ed. 542 (1884) (stating that "federal courts should ordinarily refrain from enjoining ongoing state criminal prosecutions.... the restraining of an ongoing prosecution would entail an unseemly failure to give effect to the principle that state courts have the solemn responsibility, equally with the federal courts 'to guard, enforce, and protect every right granted or secured by the constitution of the United States ...'"); *Middlesex,* 457 U.S. at 431, 102 S.Ct. at 2521 (stating that "Minimal respect for the state processes, of course, precludes any *presumption* that the state courts will not safeguard federal constitutional rights").

**22.** *Thomas,* 807 F.2d at 456, relies on *Patsy v. Florida Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982); *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1983); *City Bank Farmers' Trust Co. v. Schnader,* 291 U.S. 24, 54 S.Ct. 259, 78 L.Ed. 628 (1934); and *Bacon v. Rutland Ry. Co.,* 232 U.S. 134, 34 S.Ct. 283, 58 L.Ed. 538 (1914).

**23.** In *Patsy v. Florida Board of Regents,* the plaintiff alleged that, though well-qualified, she had been rejected for more than thirteen positions by her employer, Florida International University. The Supreme Court held that plaintiff was entitled to bring a § 1983 action in federal district court without exhausting administrative remedies provided by state statutes and

cases, *City Bank Farmers' Trust Co. v. Schnader* and *Bacon v. Rutland R. Co.*, the only administrative proceedings that had occurred prior to filing of the federal complaints were of a legislative nature.[24] *City Bank* and *Bacon* stand for the proposition, restated recently by the Supreme Court in *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), discussed *supra*, that a party may file a claim in federal court challenging a completed state administrative proceeding that is legislative in character. In those circumstances, a party is not required to pursue a state appeal remedy before asserting a federal claim in federal court. And *Monroe v. Pape* and *Patsy v. Florida Board of Regents* stand for the proposition, first clearly enunciated in *Monroe*,

that a party need not exhaust state administrative or judicial remedies before bringing a § 1983 action. While there is tension between this principle and the principle of *Younger* that federal courts should not interfere in pending state criminal, civil enforcement, or administrative enforcement proceedings, the Supreme Court has viewed the *Monroe* and *Younger* lines of cases as distinguishable. The latter involve ongoing enforcement proceedings brought by the state to vindicate important state interests, while the former involve no such pending proceedings.[25] This is perhaps the final and most telling feature rendering the cases cited in *Thomas* inapposite: none involved enforcement proceedings initiated by the state to vindicate important state interests.

While the Court finds *Thomas* unpersua-

regulations for employment discrimination grievances. 457 U.S. at 516, 102 S.Ct. at 2568.

In *Monroe v. Pape*, the petitioners alleged that the "invasion of [Monroe's] home and the subsequent search without a warrant and the arrest and detention of Mr. Monroe without a warrant and without arraignment" constituted a deprivation of their constitutional rights by agents acting under color of state law. 365 U.S. at 170, 81 S.Ct. at 475. The Supreme Court held that petitioners were not required first to seek enforcement in state court of state statutory and constitutional provisions outlawing unreasonable searches before seeking relief in federal court. "The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." 365 U.S. at 183, 81 S.Ct. at 482.

Neither case involved a pending or completed state proceeding, whether before a state court or state agency. In neither case had the state brought an enforcement action to vindicate an important state interest.

**24.** In *City Bank*, the Supreme Court held that a state administrative proceeding in which an appraiser appointed by the Pennsylvania Department of Revenue appraised property for purposes of inheritance tax was legislative in nature, and hence could be challenged in federal court without exhausting state appellate court remedies. This case, then, like *New Orleans Public Service, Inc. v. New Orleans City Council*, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), discussed *supra*, stands for the rule that a party has a choice of proceeding either in federal or in state court to challenge a completed state administrative action that is legislative or "purely administrative" in nature.

Similarly, in *Bacon v. Rutland Ry. Co.*, the Supreme Court held that a proceeding before the Public Service Commission of Vermont concerning a particular railway passenger station was legislative in nature and that the final outcome of this legislative proceeding could be challenged in federal court without appealing first to state courts. Again, it should be noted that *Bacon* did not involve an agency enforcement action, judicial in nature, designed to vindicate an important state interest. In fact, the Supreme Court in *New Orleans Public Service Commission v. New Orleans City Council* cites *Bacon* as support for the proposition that where "state-court review is not an extension of the legislative process," a claim based on agency legislative action is "ripe for federal review when the [legislative] order was entered." 109 S.Ct. at 2520.

**25.** See, e.g., *Patsy v. Board of Regents of Florida*, 457 U.S. at 518–19, 102 S.Ct. at 2569 (White, J., concurring):

The result today is fully consistent with our decisions that a defendant in a civil or administrative enforcement proceeding may not enjoin and sidetrack that proceeding by resorting to a § 1983 action in federal court, *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979), and that a federal action should be stayed pending determination of state-law issues central to the constitutional dispute. *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

sive,[26] it is not unsympathetic to the desire, apparent in *Thomas*, to limit the expansion of the *Younger* abstention doctrine. The limiting factor, however, appears to be the presence or absence of an enforcement action initiated by the state to vindicate an important interest.[27] The comity concerns expressed in *Huffman v. Pursue*, which led the Supreme Court to hold that a federal court should not entertain a § 1983 action filed during the juncture between state trial court proceedings and appellate court proceedings, are applicable here, and militate against entertaining a claim filed at the juncture between a state administrative enforcement action, commenced by the state to vindicate an important state interest, and state court appellate review of that action provided for by state statute. The Court therefore concludes that a state administrative enforcement proceeding was ongoing at the time plaintiff filed its complaint in federal court, and that the *Younger* abstention doctrine applies.

It is not without some reluctance that the Court reaches this conclusion. As indicated, the conclusion that *Younger* applies at the juncture between state administrative and state court appeal proceedings is premised chiefly on the comity concerns that are expressed in *Huffman* and that have become the driving force behind *Younger* and its progeny. In particular, there is the principle that state courts have parity or equality with federal courts in resolving federal constitutional questions. This principle may not capture accurately or adequately the relationship between federal and state courts envisioned by the Constitution. More than one thoughtful commentator has suggested that changes wrought in the constitutional fabric during Reconstruction, including § 1983, make clear the preferred position of federal courts vis-a-vis state courts in resolving claims of deprivation of constitutional rights.[28] It may even be plausibly argued that the extension of *Younger* to the context at bar is inconsistent with notions of federalism prevailing during the period of the Constitution's framing.[29] However this

**26.** The Court is not alone in finding *Thomas* less than convincing. No opinion has been found approving of the conclusion reached in *Thomas*, and several district court opinions either criticizing the opinion or distinguishing it were found. In *Alleghany Corp. v. Haase*, 708 F.Supp. 1507 (W.D.Wis.1989), *reversed on other grounds*, 896 F.2d 1046, 1053 (7th Cir.1990), the court criticized and refused to follow the conclusion in *Thomas* that a party could avoid state court appellate review procedures for administrative enforcement determinations by simply declining to appeal to state court and instead filing a § 1983 action with a federal court.

*Thomas* was distinguished in *Watts v. Burkhart*, 854 F.2d at 849, and *Fore Way Express, Inc. v. Wisconsin Dept. of Industry*, 660 F.Supp. 310 (E.D.Wis.1987) (finding that "further state administrative review followed by appellate review in state courts" was pending).

**27.** *See* comments of Justice White, n. 25, *supra; see also New Orleans Public Service, Inc. v. Council of New Orleans*, 109 S.Ct. at 2519 (observing that "[w]hile we have expanded *Younger* beyond criminal proceedings, and even beyond proceedings in courts, we have never extended it to proceedings that are not 'judicial in nature' ").

**28.** *See, e.g.,* Zeigler, *A Reassessment of the Younger Doctrine in Light of the Legislative History of Reconstruction*, 1983 Duke L.J. 987, concluding that

The constitutional and statutory enactments of the Reconstruction era wrought permanent changes in the pre-Civil War relationship between the state and federal governments. To the extent the Younger doctrine is founded on a conception of federalism that is inconsistent with the fourteenth amendment and concomitant congressional action, it should be abandoned;

Fiss, *Dombrowski*, 86 Yale L.J. 1103 (1977); Soifer & Macgill, *The Younger Doctrine: Reconstructing Reconstruction*, 55 Texas L.Rev. 1141 (1977).

**29.** *See Martin v. Hunter's Lessee*, 14 U.S. 304, 345, 4 L.Ed. 97 (1816) (upholding federal appellate review of state court decisions and observing that without such power "our national rights might otherwise be compromitted, and our national peace been dangered"); *Bank of the United States v. Deveaux*, 9 U.S. 61, 3 L.Ed. 38 (1809) (extending diversity jurisdiction to corporations and observing:

The judicial department was introduced into the American constitution under impressions, and with views, which are too apparent not to be perceived by all. However true the fact may be, that the tribunals of the states will administer justice impartially as those of the nation, to parties of every description, it is not less true that the constitution itself either entertains apprehensions on this subject, or views with such indulgence the possible fears

may be, this Court is not privileged to ignore the Supreme Court's modern pronouncements on the nature of the *Younger* doctrine. Until a searching reexamination of the doctrine results in its revision, this Court is bound to apply it as it exists.

## IV. Exceptions to Application of *Younger*

■ Having found *Younger* applicable, the Court must next consider whether any factors exist to support an exception. Two grounds for such an exception were recognized in *Younger* itself—that of "irreparable injury," 401 U.S. at 46–48, 91 S.Ct. at 751–52, and that for a state "statute ... flagrantly and patently violative of express constitutional prohibitions." 401 U.S. at 53–54, 91 S.Ct. at 755, *quoting Watson v. Buck*, 313 U.S. 387, 402, 61 S.Ct. 962, 967, 85 L.Ed. 1416 (1941). Plaintiff here relies only on the second ground,[30] alleging that "[b]ecause the state's action in conditioning Dr. Phillips' medical license in part on her renunciation of her religious views is 'flagrantly and patently violative of express constitutional prohibitions,' ... the court may enjoin this action notwithstanding the availability of appellate review of the decision in the state judiciary."[31] But the ar-

gument is unavailing to plaintiff because the exception for flagrantly unconstitutional state acts is too narrow to reach this case.

The Supreme Court has given an extremely narrow interpretation to the exception for flagrantly unconstitutional state acts. The Fourth Circuit, in a lengthy review of the exceptions to *Younger* permitted by the Supreme Court, has observed that all of the cases involving "exceptional circumstances" where the Supreme Court permitted an exception to application of *Younger* involved "situations in which the federal plaintiff's claim for federal relief was not such as could be resolved in a pending state proceeding." *Simopoulos v. Virginia State Bd. of Medicine*, 644 F.2d 321, 328 (4th Cir.1981). On its face, the Fourth Circuit noted, the exception for flagrantly unconstitutional state action does not require a showing of inability to obtain adequate relief in state proceedings. *Id.* Yet, as the Fourth Circuit went on to observe, the exception has been so narrowly construed by the Supreme Court as to be "meaningless."[32] The Fourth Circuit concluded that:

and apprehensions of suitors, that it has established national tribunals for the decision of controversies between aliens and a citizen, or between citizens of different states). *Id.* at 87; The Federalist No. 81, at 486 (A. Hamilton) (New American Library ed. 1961), explaining that the Constitution does not mandate that state courts be designated as the lower federal courts because

[t]here are ... substantial reasons against such a provision: the most discerning cannot foresee how far the prevalency of a local spirit may be found to disqualify the local tribunals for the jurisdiction of national causes; whilst every man may discover that courts constituted like those of some of the States would be improper channels of the judicial authority of the Union. State judges, holding their offices during pleasure, or from year to year, will be too little independent to be relied upon for the inflexible execution of the national laws[;]

Amar, *The Two–Tiered Structure of the Judiciary Act of 1789*, 138 U.Pa.L.Rev. 1499, 1535–36 (1990); Friedman, *A Different Dialogue: The Supreme Court, Congress and Federal Jurisdiction*, 85 Nw.U.L.Rev. 1, 38 n. 200 (1990).

30. Even had plaintiff relied on the exception for "irreparable harm," such reliance would be rejected. The exception for irreparable harm per-

tains to those instances where a federal plaintiff would be unable to receive relief in the ongoing state proceeding. One such example, offered by the Supreme Court in *Younger*, is repeated, baseless prosecutions brought against an individual for purposes of harassment. In such a case, abstaining and remitting a federal plaintiff to raise their claim in the context of another state enforcement proceeding would not provide an adequate remedy to the federal plaintiff. *See Younger*, 401 U.S. at 46–51, 91 S.Ct. at 751–54 (discussing *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)). Plaintiff has made no showing here that the state court appellate proceedings available to it could not afford an adequate remedy for plaintiff's constitutional claim.

31. Plaintiff's Notice and Motion for Temporary Restraining Order at 5–6; *see also* Reply Memorandum in Support of Plaintiff's Motion for Injunctive Relief at 1 n. 1 and 4.

32. The Fourth Circuit observed that:

... in *Juidice,* [430 U.S. at 388, 97 S.Ct. at 1218] the Supreme Court defined the "flagrantly and patently" unconstitutional exceptions with greater specificity and more narrowly as requiring invalidity "in every clause,

As a practical matter, then, "the center-piece of a test for the application of *Younger*" is always the adequacy of the state forum in providing the federal plaintiff an opportunity to raise his constitutional claim and, if there is, comity commands abstention by the federal court.[33]

■ Whether the "flagrantly unconstitutional" exception has been entirely collapsed into the "irreparable harm" exception, as the Fourth Circuit's opinion in *Simopoulos* suggests, or whether there remains some exception for state enforcement actions so patently unconstitutional and harmful as to merit an exception to *Younger*, need not be decided here. The actions of the Virginia Board of Medicine do not appear flagrantly unconstitutional. In fact, resolution of the merits of this case would most likely have been a more simple matter than resolving the abstention issues raised by the case. Plaintiff alleges that the Board found plaintiff to be "ill" and unfit to practice medicine because of her professed religious beliefs. Plaintiff contends that the Board would have required that she renounce her religious beliefs in order to continue to practice psychiatry. In particular, plaintiff contends that the

Board, in its final order, adopted the following finding of the hearing officer:

The rationale that § 54.1–2914(A)(11) is violated is premised on the conclusion that [Dr. Phillips'] acts were influenced by her seasonal mood disorder, the medication taken therefore, and/or *that her extreme, aberrant (cockamamy) religious beliefs and practices evidence illness.*

Plaintiff's Complaint at 5. A review of the Board's final order, however, indicates that the Board adopted the hearing officer's findings only in part, and that the particular finding objected to by plaintiff was not adopted by the board as a basis for its determination to revoke plaintiff's license.[34] In its Order of July 24, 1990, at 1 (emphasis added), the Board stated:

Now having properly considered the transcript, the hearing officer's report, and the record in this matter, the Board hereby, by clear and convincing evidence, adopts *in part* the proposed Findings of Facts of the hearing officer found on pages 84–107 of his report, *as modified by* the Board, *to wit....*

The Board then proceeded to list eight findings of fact, none of which included the finding of the hearing officer, pertaining to religious beliefs, objected to by plaintiff.[35]

---

sentence, and paragraph, and in whatever manner and against whomever an effort might be made to apply it," a standard so rigorous as to make the exception, in the words of Professor Laycock, "meaningless." *Simopoulos*, 644 F.2d at 329 (footnotes omitted), *quoting* Laycock, Federal Interference with State Prosecutions: The Need for Prospective Relief, 1977 Supreme Court Review 193, 198.

**33.** *Simopoulos*, 644 F.2d at 329, *quoting* Aldisert, 11 Conn. L.Rev. at 197.

**34.** But, as the Court noted from the bench at oral argument, there can be little doubt that it is constitutionally impermissible for the state to revoke a medical license on the basis of the holder's religious views, however unorthodox they may be. Such action would infringe the holder's First Amendment rights. *See McDaniel v. Paty*, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (invalidating Tennessee constitutional provision that barred "ministers of the Gospel or priests of any denomination" from serving as delegates to state constitutional convention); *Fowler v. Rhode Island*, 345 U.S. 67, 69, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953); *cf. Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d

33 (invalidating state charitable solicitation requirements that discriminated against religious organizations). Of course, the holder of a license cannot rely on her religious views to excuse failures to comply with state medical licensing requirements. *Cf. Employment Div., Dept. of Human Resources of Oregon v. Smith*, — U.S. —, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (holding that free exercise clause did not prohibit application of Oregon drug laws to ceremonial ingestion of peyote and, thus, state could deny claimants unemployment compensation for dismissal for work-related misconduct based on ingestion of the drug).

**35.** The Board's Report states, for example:

the Board hereby ... adopts in part the proposed Findings of Facts of the hearing officer found on pages 84–107 of his report, as modified by the Board, to wit:

1. By Dr. Phillips' own admission during the course of outpatient psychotherapy with Patient A, an individual diagnosed with Axis 1—a Bi-polar Disorder and Axis II—a Borderline Personality Disorder, Dr. Phillips visited the patient's residence in order to "bless" and "anoint" her house and yard and furthermore

While the state court during appellate review will have more opportunity to determine whether the Board's determination to revoke plaintiff's license was infected by an unconstitutional belief that plaintiff's religious beliefs were evidence of an illness that necessitated barring her from practice, the current record before the Court lacks sufficient proof of such a claim. The court cannot conclude from the record before it that flagrantly unconstitutional state action is here at issue which would merit an exception to *Younger* abstention.

An appropriate Order has entered, dismissing plaintiff's complaint without prejudice.

Richard Charley Shadyac, Jr., Shadyac & Shadyac, Arlington, Va., for plaintiffs.

Tara M. McCarthy, Slenker, Brandt, Jennings & Johnston, Fairfax, Va., for defendant.

prayed in "tongues" during psychotherapy sessions. Following cessation of therapy on March 3, 1988, Dr. Phillips sent the patient an unsolicited article on Religious Cults: (i.e. *The Kingdom of the Cult*).

. . . . .

5. During the period July 10, 1987 through June 6, 1989, Dr. Phillips failed to maintain

adequate records of her dispensing of controlled substances.

6. During the period July 21, 1987 through March 30, 1989, Dr. Phillips self-prescribed for her own unauthorized use in order to treat atypical depression with a seasonal mood disorder, the following controlled substances concomitantly. . . .